819 A.2d 471 (2003)
359 N.J. Super. 201
Lynne C. LERNER, Plaintiff-Appellant,
v.
William F. LAUFER, Esq. and Courter, Kobert, Laufer, Purcell & Cohen, P.C., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 13, 2003.
Decided April 8, 2003.
*472 Andrew Rubin argued the cause for appellant (Andrew Rubin, Bloomfield, attorneys; Mr. Rubin and Hilton L. Stein, Montville, on the brief).
Marianne Espinosa Murphy argued the cause for respondents (Tompkins, McGuire, Wachenfeld & Barry, attorneys; Ms. Murphy, on the brief).
Hanan M. Isaacs argued the cause for amicus curiae New Jersey Association of Professional Mediators (Hanan M. Isaacs, attorney; Mr. Isaacs, Suzanne M. McSorley, Princeton, Robert E. Margulies, New Jersey City, Douglas K. Schoenberg and Gale Wachs, Bridgewater, on the brief).
Before Judges A.A. RODRÍGUEZ, WELLS and PAYNE.
The opinion of the court was delivered by WELLS, J.A.D.
We address in this appeal from a judgment dismissing a legal malpractice action, the issue of whether and to what extent, if any, an attorney may limit the scope of his representation of a matrimonial client in reviewing a mediated property settlement agreement (PSA).
The circumstances out of which the appeal arises are undisputed. The plaintiff, Lynne C. Lerner, was married to Michael *473 H. Lerner in November 1969 and had been married to him 24 years when he filed an action for divorce in 1994. The couple had two children, a son and a daughter, born in 1974 and 1976. Michael contacted a New York lawyer, Brett Meyer, who represented him and his company in New York, but who also was a friend of the family and trusted by Lynne, to mediate a PSA. The couple had amassed a considerable fortune.
Meyer mediated over several sessions as the result of which a comprehensive, written PSA emerged. He then gave Lynne a list of New Jersey attorneys to consult prior to signing the agreement. That list, in turn, had been given to Meyer by James Andrews, a New Jersey attorney who would represent Michael in the divorce proceedings. While the record does not disclose whether Andrews alerted everyone on the list, he did alert the defendant, William Laufer, that Lynne might call, and on January 26, 1994, sent him a draft of the mediated PSA. Lynne selected Laufer of the firm of Courter, Kobert, Laufer, Purcell & Cohen, P.C. (CKLP & C) from the list. Laufer was an experienced matrimonial attorney and held himself out as a specialist in the field.
On January 28, 1994, Lynne and Laufer spoke by telephone. On February 2, 1994, the first time that Lynne and Laufer met in person, Laufer produced a two-page letter, dated that day, for Lynne to consider. While the letter is of some length, its importance to this case is such that we reproduce it in full:[1]
Dear Mrs. Lerner:
This letter will confirm that you have retained my law firm for the purpose of reviewing a Property Settlement Agreement that was the product of divorce mediation conducted by Mr. Brett J. Meyer, an Attorney at Law of the State of New York.
This letter will further confirm that I have not conducted any discovery in this matter on your behalf. I have not reviewed income tax returns or other financial documentation to confirm or verify your husband's income for the past several years. I have no information concerning the gross and net values of the properties in Summit, Belmar, Teluride, Colorado or Short Hills, New Jersey. I have seen no information concerning the value of the stock in Marisa Christina, Inc. or the other corporations referred to on Page 10 of the Property Settlement Agreement. In addition, I have not had the opportunity to review any documentation concerning the respective incomes, assets, liabilities or other financial information in your case.
Based upon the fact that I have not had an opportunity to conduct full and complete discovery in this matter, including but not limited to appraisals of real estate and business interests, depositions and interrogatories, I am not in a position to advise you as to whether or not the Agreement is fair and equitable and whether or not you should execute the Agreement as prepared. Accordingly, it is difficult for me to make a recommendation as to whether you should accept the sum of $500,000.00 and 15% of the stock that the two of you have acquired during the marriage in consideration for waiving your right to 85% of the stock that was acquired during the marriage.
In sum, I am not in a position to make a recommendation or determination that the Property Settlement Agreement as *474 prepared represents a fair and reasonable compromise of the issues concerning equitable distribution or whether the amount of alimony and/or child support that you will receive under the terms of the Agreement is an amount that would be awarded to you if, in fact, this matter proceeded to trial.
This letter will confirm that I have reviewed and suggested various modifications to the Property Settlement Agreement to the mediator. I have discussed the contents of the Agreement with you, and in your opinion you are satisfied that the Agreement represents a fair and reasonable compromise of all issues arising from the marital relationship. You have indicated to me that you are entering into the Agreement freely and voluntarily and that you have been satisfied with the services of the mediator in this matter. You have further indicated to me that the Agreement will be providing you with a substantial amount of assets in excess of Three Million Dollars, and that you will be receiving alimony payments as specifically set forth in Paragraph 5 of the Property Settlement Agreement.
After reviewing the Agreement with you and Mr. Meyer, I am satisfied that you understand the terms and conditions of the Agreement; that you feel that you are receiving a fair and equitable amount of the assets that were acquired during the marriage; and that the amount of support that is provided in the Agreement will, in fact, provide you with an income that will allow you to maintain a respectable lifestyle.
This letter will also confirm that you are accepting my services based upon the representations specifically set forth above and that under no circumstances will you now or in the future be asserting any claims against me or my firm arising from the negotiation or execution of your Property Settlement Agreement.
Thank you for the opportunity to be of service to you in this matter, and if I can be of any future assistance, please do not hesitate to contact me.
Lynne read and signed the letter. She and Laufer then conferenced for about an hour, during which time each term of the mediated PSA was read and discussed. In addition, they discussed the value of the couple's interest in Marisa Christina, a very valuable company doing business in New York. Thereupon, a four-way conference ensued between Lynne, Laufer, Michael and Andrews, and the PSA was executed.
Five days later, on February 7, 1994, a standard retainer agreement issued from Laufer's office to Lynne, which she signed and returned. It provided in part:
The legal services which I anticipate will be rendered to you will involve legal research and factual investigation as to (i) assets which you owned at the time you were married, assets which were acquired over the course of the marriage; (ii) income and your ability/need for support; (iii) grounds for divorce; (iv) custody and visitation, and (v) payment of counsel fees and costs.
The retainer agreement also provided that the plaintiff:
will have the benefit of my [defendants'] advice and my prediction of the likely results if the matter were not settled, and were instead submitted for judicial resolution.
On April 11, 1994, an uncontested divorce proceeding took place before Judge Glickman. Lynne was represented by William Laufer and Michael by James Andrews. The cause of action proved was sexual desertion. Regarding the PSA, the following colloquy occurred between *475 Lynne and Laufer on her direct examination:
Q. Now isn't it a fact that this agreement that is quite extensive and deals with the substantial amount of assets and provides you with substantial amount of alimony was the product of a mediation process that took place with Mr. [Brett] Meyer, an attorney in New York; is that correct?
A. Yes.
Q. And Mr. Meyer was an attorney, basically, that you and your husband had contacted and worked with before you even contacted me or, I believe before you [sic] husband even contacted Mr. Andrews; isn't that correct?
A. Yes.
Q. And this matter was submitted to us in thepretty much in the form of an agreement; isn't that correct?
A. Yes.
Q. Now, after you met with me there were several modifications to that agreement; isn't that true?
A. Yes.
Q. But the basis of the agreement was-was the result of a mediation with Mr. Meyer; isn't that correct?
A. Yes.
Q. And in fact, I had you execute a letter back in February of 1994 pretty much explaining my participation in this case; more specifically, that I had not been involved in any major discovery proceedings; isn't that correct?
A. Yes.
Q. In other words, when you came to see me and you signed the letter that I gave to you, basically there was a waiver of appraisals on houses, appraisal on the business in New York, and really the review of tax returns, et cetera, of your husband; isn't that correct?
A. Yes.
Q. You relied upon thethe representations that were made by your husband to Mr. Meyer, and you relied upon Mr. Meyer; isn't that true?
A. Yes, I did.
Q. Okay. Now you understand my participation and role in this matter.
A. Yes, I do.
Q. And you agree with that.
A. Yes.
....
Q. And have you been satisfied with the services that I've rendered to you in this matter?
A. Yes.
The divorce was granted, and the PSA was incorporated into the final judgment dated May 6, 1994. We note that during the course of his representation of Lynne between January 28, 1994 and April 11, 1994, the date of the divorce hearing, Laufer suggested changes in the mediated PSA either to Meyer or to Andrews. Some of the changes were adopted and some were not. Later during his deposition, Laufer stated in this respect:
Q. What did you say to Lynne Lerner with respect to these revisions, not substantively as you just testified to, but rather as to what you envisioned your role to be in reviewing the property settlement agreement that had been presented to you?
A. My role, which was very clear to me, and which was so clear to me I felt it was important to put into writing, was not to negotiate a new agreement for her, not to create litigation, not to go into valuation of assets, which would have been fine *476 with me, by the way, but to simply make sure that thesethis agreement was clear and concise, and if there was any interpretation problems, that I should take care of those for her, basically to revise the agreement only when necessary to make sure that things were clarified.
It is unnecessary for purpose of this opinion to detail the terms of the PSA. But because one subject covered by it became the springboard for what later happened, we recite, in part, one of its clauses. It dealt with the Lerners' interests in Marisa Christina, a women's clothing company headquartered in New York. The clause stated:
The Husband and the Wife have both worked at Marisa [Christina] and both recognize that the value of Marisa may be significant. The Wife knows that Marisa has contemplated an Initial Public Offering ("I.P.O.") and that an I.P.O. could cause the Husband's ownership of Marisa to substantially increase in value and such potential value has been discussed between the Husband and the Wife and same is understood by both parties. Moreover, it is also understood that the value which could be placed on the Marisa stock in the event of an I.P.O. could be approximately eight to fifteen times projected earnings.
Lynne asserts that during the course of Meyer's mediation, representations were made to her that a decision had been made not to take Marisa public. Notwithstanding, she claims that within two months of the entry of the divorce, she discovered that Marisa Christina was about to proceed with an initial public offering. Lynne became outraged. She engaged Bruce Nagel and moved to set aside the Judgment of Divorce as fraudulent. She also instituted a suit against Meyer. Judge Glickman, finding that both parties had lied about the cause of action, vacated the judgment of divorce and dismissed the complaint. The judge, however, "took no position" with respect to the validity or enforceability of the PSA.
Following that action, the parties engaged once again in a round of mediation before Paul Rowe, Esquire. A second amended PSA was agreed upon, a divorce action was re-filed, and the parties appeared for a second uncontested divorce proceeding on April 12, 1999. Lynne testified at the hearing with respect to the revised PSA:
BY MR. NAGEL:
Q. I made it clear to you that Judge Glickman was prepared to try this case this month, in fact, within a-a couple weeks of today's date.
A. Yes.
Q. And I made it clear to you that if you did not want to accept the settlement terms for any reason, they could be good, bad, or indifferent, you had the right to have Judge Glickman decide this case. I made that clear to you.
A. Yes.
Q, And I, also, outlined for you what I thought the litigation budget would be to try the case.
A. Yes.
Q. And I, also, gave you my opinions as to the likelihood of success and the risks involved in trial.
A. Yes.
In September 1999, Lynne commenced the present malpractice action against Laufer through the office of Hilton Stein. The central allegations of the complaint were that Laufer engaged in negotiations on her behalf and drafted contractual language detrimental to her interests and that as a consequence of his advice, she *477 entered into a PSA that was inequitable and unconscionable and represented a small portion of the equitable distribution to which she was entitled. She further alleged that:
32. The Defendants CKLP & C, Laufer and Does, were negligent in their representation of the Plaintiff's interests in the matrimonial litigation, including, but not limited to, negligence in failing to conduct appropriate discovery concerning the assets subject to equitable distribution, the failure to retain experts to value the assets available for equitable distribution, negligence in the negotiation and preparation of the Property Settlement Agreement ultimately executed by the parties; and failure to evaluate and determine the appropriate amount of alimony, and equitable distribution Plaintiff would be entitled to under the law.
....
39. Defendant Laufer breached his duty to Plaintiff by his failure to exercise the knowledge, skill, ability and devotion ordinarily possessed and employed by members of the legal profession similarly situated in connection with the discharge of his responsibilities to Plaintiff and breached his duty to utilize reasonable care and prudence in connection with those responsibilities.
She sought compensatory, special and consequential damages. An affidavit of merit, executed by Judith Q. Bielan, Esquire was served.
Discovery ensued during which the parties' depositions were taken. Lynne produced an expert's report from Bielan who was also deposed. Laufer moved for summary judgment in the fall of 2001 and argument was heard on November 16, 2001. The judge considered all the discovery, including depositions taken in 1997 in the context of the second divorce action, and Bielan's report and deposition.
That report rested upon certain factual assertions, which Bielan derived from her extensive review of the depositions, answers to interrogatories, key court documents and other documentary evidence provided to her. She considered the following, among other, salient facts:
7. Mr. Laufer conducted no discovery in this matter and reviewed no financial information during this case. However, he stated that, prior to 2/2/94, he was aware that Mr. Lerner was considering an IPO for Marisa Christina, his company, although he did not know the status of any plans. He made no requests for financial information from either his client or his adversary. He never reviewed a single tax return from either party.
8. Mr. Laufer never asked Mrs. Lerner for either general information or details of the mediation sessions run by Mr. Meyer. He did not know how many sessions were held or whether they were joint or individual sessions. He had no idea whether Mr. Meyer had any financial information about the parties during these sessions or whether either had completed a CIS. Mr. Laufer made no independent determination of the fairness of the agreement reached through mediation.
9. He never asked Mrs. Lerner to prepare a CIS or a budget to reflect what she needed to live on as he stated he "would do with a client [he] was representing from scratch." He made no assessment of the interest income she could expect to earn *478 from the assets she was to get in equitable distribution according to the PSA. He made no analysis of the total income, including alimony and interest income, on which she would be expected to live. No ballpark figure was ever estimated as to her earnings.
....
14. Mr. Laufer stated in both his March 12, 1997 and April 25, 2001 depositions that as of 1993 he was a certified arbitrator of matrimonial proceedings, and as of 1995 he was a certified mediator, and that even though he was not certified at the time, as of 1994 he had mediated approximately twenty matrimonial matters. He also stated that he did not ask Mrs. Lerner anything about the mediation process in which she had engaged with her husband and Brett Meyer, except to inquire as to whether she was satisfied with it.
Citing McCullough v. Sullivan, 102 N.J.L. 381, 132 A. 102 (E. & A. 1926), Bielan opined on the standard of care for attorneys, stating:
An attorney owes his or her client the duties of diligence, competence, faithfulness and good judgment in pursuit of the client's objectives. The State of New Jersey has adopted a two-part standard of care which prohibits both (a) gross negligence in any one particular matter and (b) a "pattern of negligence" or neglect in handling legal matters generally.
The individual elements of the duty of care are addressed individually in the Rules of Professional Conduct. RPC 1.1 governs the duty of competence, RPC 1.3 outlines the duty of diligence and Rules 1.7, 1.8 and 1.9 deal with the duty of faithfulness. The Court has also defined the "quality" of an attorney's representation as being comprised of his or her knowledge, skill and effort.
In addition to these affirmative duties, RPC 1.2(c) prohibits an attorney from limiting the scope of his or her representation absent the consent of the client after consultation. In light of the prohibition in RPC 1.8(h) against prospectively limiting malpractice liability, it is doubtful as to whether and under what circumstances any such arrangement would be enforceable.
Furthermore, Laufer held himself out to be a specialist in matrimonial law.
....
Case law indicates then that when an attorney holds himself out to have an expertise in a certain area, he should be held to a higher standard in malpractice cases. See Procanik v. Cillo, 226 N.J.Super. 132, 543 A.2d 985 (App.Div. 1988); See also Cellucci v. Bronstein, 277 N.J.Super. 506, 649 A.2d 1333 (App. Div.1994).
Bielan then rendered her opinion as to how Laufer breached his duty. We excerpt from her report a series of passages:
Laufer breached his duties of competence, faithfulness and good judgment in failing to discuss the current state of the law with his client and in failing to advocate on her behalf for a truly "equitable distribution" of the marital assets. A review of the original PSA would raise a red flag for the ordinary attorney representing someone in a marriage of over twenty years. Simply, there are a myriad of questions a reasonable general practitioner would ask with a factual scenario such as the one in this case.
....
Is the client entering into this out of guilt? Does the client understand what she is giving up, that she would be entitled *479 to a fifty/fifty, or close to fifty/fifty split of all assets based on the duration of the marriage and other relevant facts of the case? What are the details of the mediator's role here? What are the details of the Mediator's knowledge regarding the IPO?
Furthermore, the manner in which Mrs. Lerner becomes Mr. Laufer's client and the way her case is initially handled by Laufer meet with a number of irregularities.
....
The first contact Mr. Laufer had with Mrs. Lerner was on January 28th, 1994, the Property PSA was signed on February 2nd, 1994, and the retainer agreement was signed on February 7th, 1994. The entire process took less than a week. The first contact he had with Lynne Lerner was January 28th, and the PSA was executed on February 2nd. At no time did Mr. Laufer make an independent evaluation as to whether or not the agreement was fair and equitable on behalf of Lynne Lerner, nor did he make a determination of conscionability. In my opinion, he had a duty to do so and he breached said duty.
At no time did Laufer review or discuss the statutory alimony criteria with Lerner or anyone else for that matter.
....
He never asked to review any of her joint tax returns, nor asked for any financial information regarding Marisa Christina Company or any other asset of the marriage. In my opinion, he had a duty to do so and he breached said duty.
Laufer indicated that he did not believe it was his obligation or duty to investigate the Mediator in this case. Considering the manner in which this case started and the rush and quickness with which it was concluded, even more so Mr. Laufer should have asked extensive questions as to Mr. Meyer's relationship and involvement with the parties, especially since Mr. Meyer was not a New Jersey attorney or a specialist in either family law or mediation. In my opinion, he had a duty to do so, and breached said duty.
....
He clearly never explained to her that she was entitled to fifty/fifty or close to a fifty/fifty split of the assets and debts as it pertains to equitable distribution. His advice to her was "well basically, you know, in equitable distribution, it's divided in an equitable fashion and certain assets are divided in different ways." This advice was not enough. In my opinion he had a duty to discuss the facts of her case and how they fit squarely into a fifty/fifty scenario, and by omitting to do so, he breached said duty.
Mr. Laufer was aware that Mrs. Lerner told Mr. Lerner during the Christmas holiday season in 1993 that she was having an affair. Mr. Laufer indicated this fact played no role in his advice to Lynne Lerner. Any family law attorney knows that when one party is having an affair, most times the party feels guilty and as a result, he or she may be willing to give up a considerable amount in assets and support to which she would ordinarily be entitled if the divorce went to trial. This happens often enough that any attorney who practices in the matrimonial field with any regularity, as Mr. Laufer did, should be familiar with such situations. Clearly, the rush of signing this PSA coupled with the strong possibility that Mrs. Lerner was feeling guilty, and therefore, a vulnerable spouse in a divorce matter, would make any reasonable attorney stop, sit the client down and, at the very least, delay the process until he can evaluate with a *480 fair degree of certainty the value of each asset and the lifestyle of the parties and then explain in detail to the client what she could expect in terms of the equitable distribution and alimony, despite the adultery, if the case went to trial. The fact that this evaluation and discussion did not take place, in my opinion, was a serious omission by Mr. Laufer, who did in fact deviate from the duty of care that any reasonable attorney would have exercised under the same or similar circumstances, and therefore, by way of his omission, he breached said duty.
Bielan also found that Laufer's asserted breaches were a proximate cause of damages to Lynne. On that subject she stated:
In this matter, Laufer's breach of his duty to do even minimal discovery into the parties' assets, to inquire as to the mediator and the mediation process, to discuss in detail case law as it pertains to alimony and equitable distribution, to question the urgency with which the matter was being handled, to make a determination of fairness and conscionability, or to discuss the likely outcome in the event of trial caused Mrs. Lerner to enter into an unconscionable and unfair settlement in her divorce and caused her to incur subsequent attorney's fees in re-litigating and negotiating the final settlement, which still did not put her in the position she would have been in had the PSA been negotiated properly the first time or had she pursued the divorce action in the ordinary course of litigation.
As to Lynne's damages, Bielan opined:
As a result of Laufer's breach of his professional duty of care to his client, Mrs. Lerner agreed to and received an unfair and inequitable distribution of marital assets. As a result of Laufer's poor representations, Lynne Lerner was damaged to the extent of the difference between what an equal fifty/fifty split would have been of the assets in 1994, and what she received.
....
Clearly, a simple review of the 1993 joint tax return of the parties by Mr. Laufer would have revealed that, based on Mr. Lerner's earnings from the Marisa Christina Company, the company had a value that would far exceed any offset contemplated in the PSA that would allow Mrs. Lerner to accept only 15% of this asset. This is especially true, in my opinion, because Mrs. Lerner would have been entitled to 50% or close to 50% of that asset, due to the length of the marriage and especially with the fact that she had been an active participant in the said company.
With respect to alimony, a simple review of either the 1992 and 1993 tax returns by Mr. Laufer (showing income in excess of three million dollars) would have indicated that the alimony of $140,000-$160,000 per year was patently unfair on its face.
Laufer moved for summary judgment, and oral argument was heard on November 16, 2001.
Following an extended colloquy, the judge granted Laufer's motion for summary judgment dismissing the complaint. The judge reasoned:
I cannot believe that the law is now that she can turn around and sue the attorney who has this limitation andand collect the difference between what she got on that negotiated settlement which she said she was satisfied with and a 50/50 split. II just can't imagine that that could be the law inin the State of New Jersey.
In addition to that, I don't see anything in the expert's report and nothing has *481 been shown to me here to indicate what standard is supposed to be applied when an attorney is faced with a mediation agreement. I don't care who the mediator is. It could be the defendantthe the husband himself, the mediator.
If the agreement is I'm satisfied with that mediation, I'm satisfied with the agreement. I just want you to put it though. And then the attorney then writes and says all the limitations and she signs the letter so that she got it and, essentially, understands it. She testified under oath before a judge in this court, I guess it was, the first one, that she understood the limitations of the representation by Mr. Laufer.
Andand all of a sudden we have an expert who now says well, you can't have a limitation. Well, what is there where is there any law that says you can't have a limitation? I don't understand. There must be in the mediationin the matrimonial field there must be a recognition that an attorney who is just there to put through the agreement that a mediator has resolved is entitled to have some kind of a limitation put on his representation as long as he tells the client what it is and the client agrees with it.
That's what the RPC says. You can do it if you consult with a client and the client agrees. Andand there isn't a word in the expert's report about what the standard of care is under those circumstances. And there's nothing in the expert's report that says if you negotiate anything about the agreement, such as increase in the alimony, that you now undertake an obligation to review any everything.
....
Forfor all those reasons II think the expert report isis, as Mr. Stein is arguing, that there's all kinds of obligations being thrown out here for attorneys, but there's nothing specific. You've got to have a specific standard so an attorney sitting in his office knows what he should do or she should do if somebody comes in with this type of an agreement. And there's no standard that I can set forth inMs. Beeland's [sic] report oror in anything else.
Iyou can't just point to RPC's and saycompetence, diligence and faithfulness and say that requires an attorney to recognize that somebody is doing something out of feelings of guilt and should say don't do it.

I
Lynne argues that the judge ignored Bielan's report and, in effect, permitted Laufer to assume the role of a "potted plant" in representing her contrary to the general duty of a lawyer to act with reasonable knowledge, skill and diligence. See Ziegelheim v. Apollo, 128 N.J. 250, 260, 607 A.2d 1298 (1992). She urges that Laufer had a duty to perform those duties reasonably and usually expected of a lawyer engaged by a matrimonial client, anything short of which constituted malpractice. She claims that the letter of February 2, 1994 does not constitute either a limitation on the scope of Laufer's representation or a waiver of her right to full representation.
Citing Ziegelheim, Lynne asserts that it makes no difference that she described the second amended PSA as fair and equitable in the 1999 divorce proceeding because had Laufer competently represented her at the outset, she would not have been burdened by the baggage of the mediated PSA. In the latter respect, she contends that because the judge did not vacate the mediated agreement along with the divorce, she was presented with the prospect that were she to go to trial in the second *482 proceeding, the mediated agreement would be re-approved by the judge.
Laufer argues that Lynne ignores RPC 1.2(c), which permits an attorney to limit the scope of his representation "if the client consents after consultation." He urges that the letter of February 2, 1994 disclosed the limited purpose of his representation, the details of those services he would not perform, and that he "was not in a position to advise ... as to whether or not the agreement is fair or equitable and whether or not [Lynne] should execute the Agreement as prepared." He urges that the letter is an effective consent to limit his representation under the RPC and constitutes a waiver of full representation.
Laufer also claims that Lynne is estopped to claim in this case that the PSA was unfair because she stated under oath in the 1999 divorce proceeding that she understood that she had a right to go to trial as to all issues raised in the second divorce proceeding.

II
At the heart of this case lies a clash over two significant values to the legal community. The first is the value more recently discerned and encouraged in resolving disputes by mediation. The second is the older, more established value perceived in the resolution of conflict in adversarial proceedings by parties represented by fully independent and empowered attorneys. In the former process, it is the clients, assisted by a mediator, who arrange the disposition of their own dispute. It is largely a self-help process only tangentially informed by what the law would allow or dictate. In the latter process, it is lawyers who seek to reach ends sought by their clients under laws and rules often little understood by those clients. It is a process whereby established rights and duties are sought to be vindicated.
Mediation is now an accepted process in the resolution of family disputes except where an order has been entered under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -33. Rule 1:40-5(a) requires mediation in the case of genuine and substantial disputes over custody or parenting time issues. Furthermore, the Supreme Court has promulgated guidelines for pilot programs of mediation for economic aspects of family actions. See Pressler, Current N.J. Rules, Appendix XIX (2003).
When a PSA reached through the mediation process must be formally incorporated in a judgment of divorce, the participation of attorneys governed by the adversarial process gives rise to a question as to the nature and extent of the duty of care imposed upon the attorneys. A mediated divorce settlement may well look substantially different on the same facts than would such a settlement hammered out in adversarial proceedings. As we understand the gist of Bielan's opinion, it is that the standard of care forbids an attorney to review a mediated agreement or to participate in the proceedings leading to its incorporation in a judgment of divorce without performing many of the usual services ordinarily expected of an attorney in a fully contested divorce.
Yet the law has never foreclosed the right of competent, informed citizens to resolve their own disputes in whatever way may suit them. "Clients have the right to make the final decision as to whether, when, and how to settle their cases and as to economic and other positions to be taken with respect to issues in the case." Pressler, Current N.J. Court Rules, Appendix XVIII (2003). The voluntary settlement of disputes is a central policy dictate of the judiciary and is expressly encouraged. See Harrington v. *483 Harrington, 281 N.J.Super. 39, 46, 656 A.2d 456 (App.Div.), certif. denied, 142 N.J. 455, 663 A.2d 1361 (1995); Pascarella v. Bruck, 190 N.J.Super. 118, 125, 462 A.2d 186 (App.Div.), certif. denied, 94 N.J. 600, 468 A.2d 233 (1983). The courts approve hundreds of such settlements in all kinds of cases without once looking into their wisdom or the adequacy of the consideration that supports them. In divorce proceedings, the court daily approves settlements upon the express finding that it does not pass upon the fairness or merits of the agreement, see Pascarella, supra, 190 N.J.Super. at 125, 462 A.2d 186, so long as the parties acknowledge that the agreement was reached voluntarily and is for them, at least, fair and equitable.
RPC 1.2(c) expressly permits an attorney with the consent of the client after consultation to limit the scope of representation. In Ziegelheim, supra, the Court stated "`what constitutes a reasonable degree of care is not to be considered in a vacuum but with reference to the type of service the attorney undertakes to perform.'" 128 N.J. at 260, 607 A.2d 1298 (quoting St. Pius X House of Retreats v. Diocese of Camden, 88 N.J. 571, 588, 443 A.2d 1052 (1982)). To us that means if the service is limited by consent, then the degree of care is framed by the agreed service. We agree with the motion judge that Bielan's report fails to establish an authoritative or recognized standard of care that rises above RPC 1.2(c) and requires an attorney to advise against a mediated PSA or to discourage a client from entering into one even where there has been little or no discovery, property or business appraisals, accountings for or proof of family income or expenses or other uncovering of facts bearing upon the terms of the agreement. In a mediated agreement, all of those things are self-determined. We, therefore, see no just reason in law or policy to deny attorneys practicing matrimonial law the right to assert as a defense to claims of malpractice that they were engaged under a precisely drafted consent limiting the scope of representation.
We hold it is not a breach of the standard of care for an attorney under a signed precisely drafted consent agreement to limit the scope of representation to not perform such services in the course of representing a matrimonial client that he or she might otherwise perform absent such a consent. Except as we hereinafter note, we are satisfied that Laufer, with Lynne's consent after consultation, properly limited the scope of his representation of her under RPC 1.2(c), to a review of the terms of the mediated agreement without going outside its four corners. We acknowledge that the letter of February 2, 1994 does not quote or cite RPC 1.2(c) nor does it expressly describe itself as a "limit to the scope of representation." It, indeed, could have been more precise in those respects. Nevertheless, we reject the argument that the content failings of the letter deprive it of its intended efficacy to limit the scope of Laufer's duties as an attorney. We are satisfied that the letter is unmistakable in its import that Laufer did not and would not perform the named services, could not render an opinion on the fairness of the agreement, and could not advise Lynne whether or not to execute it.
Armed as he was with the letter of February 2, 1994, Laufer did not, therefore, breach a proved standard of care by performing no discovery or related investigatory services necessary to evaluate the merits in fact of the mediated PSA.
Furthermore, we reject the argument that by his conduct in suggesting modifications to the PSA, some of which were adopted, Laufer stepped from under *484 the protection of his limited scope of representation and became fully liable as if no such limitation existed. First, we harken to Laufer's own testimony, supra, p. 8, that his role was to see to it that the agreement was "clear and concise," to resolve interpretation problems in the text, and to clarify the agreement. Second, we discern no evidence that in performing his role Laufer's conduct actually altered Lynne's expectations of Laufer's duty or changed her demands for the kind of service she wished.
We necessarily confine our ruling to the facts of this case. No genuine issues of material fact raised a dispute relating to Lynne's competence, her general knowledge of the family's financial and personal affairs, or the voluntariness of her actions in submitting to mediation, in approving the mediator, or in seeking the approval of the PSA by the court. Lynne expressly denied that she had been subjected to any domestic violence. There is no contention that any term of the PSA violated any law, any expression of public policy endemic to family disputes generally, failed to protect the best interests of the children, or fostered non-disclosure of the family's affairs to appropriate taxing authorities. Under these circumstances, we discern no standard of attorney care that was breached.
Bielan opined that because Lynne was laden with guilt, Laufer had the obligation to discuss her feelings and to delay the process of signing the PSA to give Lynne more time to unburden that guilt. As in the case of other parts of Bielan's report, that obligation appears to be personal to Bielan. She offered no authority for it, and we cannot conclude that it forms a basis upon which a jury could determine that Laufer committed malpractice.
There are several aspects of what Laufer did, of which we expressly disapprove. We mention them in answer to Lynne's contentions that they have a bearing on the issue of Laufer's alleged malpractice. Our conclusion is that while these actions were improper, they do not alter our opinion that Laufer's overall representation of Lynne did not fall below any standard of care established by Lynne's proofs.
Laufer should not have included in his letter of February 2, 1994, an undertaking not to sue him. Such a limitation violated the express terms of RPC 1.8(h). Such a provision should not be included in a consent to limit the scope of representation presented to a client for consideration or signature. We note that in the course of these proceedings Laufer did not rely on that part of his letter as a defense. He acknowledged that the limitation was unenforceable.
Laufer should not have presented Lynne with a separate, standard form of retainer agreement. Whether or not the retainer was "boilerplate" as the motion judge thought, the point is that it conflicted with the letter of February 2, 1994. It is undisputed that that letter, not the standard retainer agreement, formed the basis of Laufer's representation. Lynne does not argue nor are there facts to support any contention that she reasonably believed the retainer supplanted the terms of the February 2 letter or that she expected from Laufer unlimited representation under the retainer. Consent to limit the scope of representation under RPC 1.2(c) should be included in a single, specifically tailored form of retainer agreement.[2]

*485 III
We now address Lynne's further claim that Laufer's representation of her caused her damage. Bielan's report asserts that Lynne "agreed to and received an unfair and inequitable distribution of marital assets." It stated, she was "damaged to the extent of the difference between what an equal fifty/fifty split would have been of the assets in 1994, and what she received." We are mindful that Ziegelheim, supra, 128 N.J. at 265, 607 A.2d 1298, holds:
that a party received a settlement that was "fair and equitable" does not mean necessarily that the party's attorney was competent or that the party would not have received a more favorable settlement had the party's incompetent attorney been competent.
Where a plaintiff alleges substandard performance in a litigated matter, the client must demonstrate that he or she would have prevailed, or would have won materially more, in the "case within the case" but for the alleged substandard performance. See Frazier v. New Jersey Mfrs. Ins. Co., 142 N.J. 590, 601, 667 A.2d 670 (1995); Albee Assocs. v. Orloff, Lowenbach, Stifelman and Siegel, P.A., 317 N.J.Super. 211, 222-23, 721 A.2d 750 (App. Div.), certif. denied, 161 N.J. 147, 735 A.2d 572 (1999); Gautam v. DeLuca, 215 N.J.Super. 388, 396-98, 521 A.2d 1343 (App.Div.), certif. denied, 109 N.J. 39, 532 A.2d 1107 (1987). Generally, the litigated matter complained of is over by way of a final judgment or settlement and relevant time frames for post-judgment proceedings have expired or such proceedings have concluded. Here, however, Lynne was successful in vacating the 1994 divorce that incorporated the PSA reviewed by Laufer. Ziegelheim is, therefore, in our opinion distinguishable.
We acknowledge that the judge did not expressly vacate the 1994 PSA. Lynne was asked, however, during her examination in the 1999 proceeding, whether she understood that the judge was prepared to litigate all issues raised in the 1999 proceeding, including the property settlement and its terms, and she expressed her understanding of the judge's willingness to do so. Our review of the record convinces us that Lynne was correct about the posture of the case. The five-year-old 1994 mediated PSA was moribund. Any contested trial in 1999 would have started from scratch and would not have dealt with the fairness or viability of either the 1994 or the proposed 1999 PSAs. The judge was prepared to try the case and decide all the unresolved issues. While Lynne urges that the judge may well have simply re-approved the 1994 PSA, we conclude that possibility is so lacking in factual foundation, given the history of the case, as to not raise a jury question.
For those reasons, we conclude that Lynne is unable to demonstrate as a matter of law that proximate cause exists between any malpractice on Laufer's part in the 1994 proceeding resulting in damages to her. Lynne won a second chance to vindicate all of her rights in the 1999 proceeding. She is thus unable to demonstrate now that the first PSA caused her damage.
Affirmed.
NOTES
[1] While we approve the letter in material part as a defense to this malpractice claim, our approval should not be construed as a conclusion that the letter is the only or even the best in form or content that such a consent to limit the scope of representation might manifest.
[2] Without intending to tread upon the jurisdiction of the Supreme Court in making and promulgating the Court Rules or in the governance of the practice of law, we would further suggest that for the protection of both attorneys and the public, when incorporation of a mediated PSA into a judgment of divorce is sought, any party's consent to limit the attorney's scope of representation under RPC 1.2(c) should be fully disclosed to the court and, if the court requests it, the executed retainer agreement should be offered to the court for review.