NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A-0835-13T4

O.P.,

    Plaintiff-Respondent,

v.

L.G-P.,

    Defendant-Appellant.

APPROVED FOR PUBLICATION

April 1, 2015

APPELLATE DIVISION

Argued February 3, 2015 - Decided April 1, 2015

Before Judges Reisner, Koblitz and Higbee.

On appeal from Superior Court of New
Jersey, Chancery Division, Family Part,
Union County, Docket No. FM-20-380-09.

Glenn E. Gelband argued the cause for
appellant.

Respondent has not filed a brief.

The opinion of the court was delivered by

KOBLITZ, J.A.D.

L.G-P.[1] appeals from many provisions in a September 6, 2013

post-judgment order resolving her pro se motion to enforce

---

[1] We use initials to preserve the confidentiality of L.G-P., who was the victim in a related domestic violence matter referred to in this opinion.

child-support provisions of the property settlement agreement (PSA), entered into when the parties were divorcing in 2009.

The parties were married in 2006 and had their only child in 2007. They had agreed in the PSA to extensive communication about their child, as well as mediation if they should not agree, both of which require significant parental cooperation. Post-judgment litigation, however, began within a few months of their divorce judgment. A final restraining order (FRO), pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, was subsequently entered against O.P. Because the motion court mistakenly enforced PSA provisions requiring mediation and frequent contact after the entry of an FRO, we reverse and remand for a plenary hearing.

In Part I of this decision, we provide the details of the child support provisions of the PSA and related motions between the parties. We provide this history not only to resolve this case, but also to illustrate how untenable constantly-changing child support payments may become, particularly after the entry of an FRO. In Part II, we explain why provisions of the preexisting PSA requiring mediation and parental communication should not be enforced after an FRO prohibiting contact between the parties is entered.

In the 2009 PSA, O.P. had agreed to pay L.G-P. child support of $135 each week[2] plus 40% of the following: unreimbursed medical expenses; medical and dental insurance premiums; "reasonable extraordinary" expenses, which included school expenses and costs for sports; a yearly agency fee for the au pair service; the au pair's weekly salary; and the au pair's yearly education stipend. The parties agreed that child support obligations could be modified in the event of changed circumstances. One change of circumstances identified in the agreement was when O.P.'s daughter from a previous marriage became emancipated. To secure their child support obligations, each parent agreed to maintain a $250,000 life insurance policy naming their son as the beneficiary.

If the parties were unable to resolve future disputes, they agreed to mediate the issues "through a mutually agreed upon mediator before seeking court intervention." After various motions were heard and decided by the court, an FRO was entered on December 3, 2010.[3]

---

[2] Support was subsequently ordered to be paid through the Probation Division. R. 5:7-4(b).

[3] We were not provided with the domestic violence complaint, nor informed of the nature of the domestic violence found by the court. The FRO, however, was provided by L.G-P. to the motion

(continued)

After the entry of the FRO, when the parties returned to court on a fourth set of pro se motions, the court ordered them to engage in mediation to resolve the issues underlying the motions. When their mediator later ended her private practice, O.P. used a friend to communicate with L.G-P. via email.

L.G-P. filed another motion on August 1, 2013, claiming that O.P. owed her: $102 for 2011 medical bills; $330.67 for 2012 medical bills; and $783.01 for medical and dental insurance premiums incurred from 2011 to 2013. She said that O.P. had not paid $562.45 for swim lessons from 2011 to 2013, $228.86 for other extracurricular expenses from 2011 to 2013, and $104.91 for a school welcome kit. She included copies of receipts and documents with her motion, and said that she had given these bills to O.P. "on multiple occasions" via email and during mediation, but he refused to pay them.

With respect to au pair expenses, L.G-P. said that O.P.'s weekly obligation was $163, but he had paid only $161.60 from 2011 through 2013, leaving a balance due of $92.40. She claimed that he owed her $443 for the au pair education stipend from 2011 through 2013, and that he did not pay his share of the

(continued)
court. A family judge may obtain domestic violence orders through family staff if not provided by the parties, and should do so if the FRO's specific terms may be relevant to the parties' application.

annual au pair agency fee for 2013. She also alleged that he owed her four missed au pair salary payments between May 2011 and October 2012 of $163 each, an additional $83 for a "missed payment" on June 10, 2011, as well as $1150 in other child care and au pair costs incurred in 2011. She claimed that as of June 28, 2013, O.P. stopped making the $163 weekly salary payments, and owed her for those payments as well.

L.G-P. also said O.P. had missed one weekly child support payment in 2011 and had failed to provide documentation to prove that his daughter from a prior marriage was still attending school and was therefore not emancipated. She asked the court to recalculate child support, and to order O.P. to reimburse her for any $29 weekly credit that he wrongly received for child support not paid to his daughter's mother. She requested proof that O.P. had life insurance in accordance with the PSA.

L.G-P. also requested that O.P. be ordered to pay her $563.79, 60% of a 2007 federal income tax refund check that she said O.P. obtained by forging her signature on the check. She requested reimbursement of $252.26 for transcripts that she ordered for her use in mediation, and $240.03 for filing fees incurred in relation to this motion. She also requested that

the court find O.P. in violation of the FRO.[4] Finally, L.G-P. requested that the court eliminate the requirement that the parties mediate their disputes because, she said, O.P. had "released" their prior mediator and mediation had not resulted in her receiving any payment toward the outstanding unpaid expenses.

O.P. filed a pro se cross-motion to strike L.G-P.'s motion. He denied terminating the mediator's services. He also said that after their mediator ended her practice, L.G-P. refused to cooperate in finding a new mediator. He believed that mediation had been helpful in resolving his disputes with L.G-P. and wished to proceed with it.

O.P. said that the mediator had resolved the issue of unreimbursed medical expenses, and that he had paid L.G-P. for all legitimate ones. He complained that L.G-P. "constantly" demanded that he pay expenses without providing proof, which she was required to do.

O.P. asked the court for relief from contributing to the cost of the au pair because their son was about to begin first grade and would be in school full-time. He complained that L.G-P. had no nanny from March 8 to May 20, 2013, but failed to

---

[4] We note that a violation of an FRO is a criminal infraction. N.J.S.A. 2C:29-9(b).

inform him of this, which resulted in his paying for services that their son did not receive. He said that he had paid his 40% share of the au pair yearly agency fee through May 2014 and that he had paid, in full, all weekly salaries, as well as his contribution for the nanny's cellular phone. He attached documents to show the various payments that he had made for medical and au pair expenses.

With respect to swim lessons and sports costs, O.P. said L.G-P. had not provided proof of these expenses. He claimed that she also failed to confer with him before incurring these expenses, contrary to the requirements of the PSA. He requested that L.G-P. be solely responsible for their payment and that she be found in contempt of court for failing to comply with previous orders requiring her to provide proof of expenses before demanding payment.

O.P. claimed that the court had already denied L.G-P.'s request for reimbursement of the school welcome kit expense and that he had made all of his weekly child support payments. He sent L.G-P. proof by certified mail of his daughter's enrollment in school and of his continued child support payments to this child's mother. He denied that he had forged L.G-P.'s name on an income tax refund check and complained that L.G-P. had been

harassing him with this false accusation for three years. He attached proof of life insurance to his moving papers.

O.P. did not believe that he had to pay for L.G-P.'s transcripts or court costs, as he had paid for similar expenses of his own. He denied violating the FRO and complained that L.G-P.'s numerous motions were a result of her failure to provide him with information in a timely manner and her refusal to accept decisions rendered in his favor.

After oral argument, the motion court ordered O.P. to pay the bills he conceded he owed. The court denied without prejudice L.G-P.'s request for payment of swim lessons and school expenses because, contrary to the terms of the agreement, L.G-P. did not discuss these costs with O.P. before she incurred them and did not provide O.P. proof of the expenses.

When L.G-P. protested that her FRO prohibited O.P. from communicating with her, the court urged her to amend the FRO to allow email communication regarding extracurricular activities. L.G-P. said she did not want to do that because she believed O.P. would send her derogatory and threatening emails.

The court found that their son still needed a live-in nanny because of L.G-P.'s variable work schedule that sometimes required her to work for long periods of time. L.G-P. agreed that O.P. had paid the yearly au pair agency fee, so that issue

was moot. The court did not address each au pair salary payment that L.G-P. said O.P. had failed to make, but focused on L.G-P.'s failure to notify O.P. in the spring of 2013 that she did not have a nanny for approximately two months. The court found that O.P. was owed a credit for payments he made during that time, and denied payment for the education stipend because L.G-P. did not provide O.P. proof that the nanny had received education. The court said that it was "wiping the slate clean," and that going forward, O.P. had to pay his 40% share of the au pair expenses. The court denied L.G-P.'s motion for child support arrears, explaining that if O.P. owed any money, then the probation department would correct the error.

The court next asked L.G-P. how O.P. was supposed to provide proof of his daughter's attendance in school if the FRO prohibited O.P. from communicating with L.G-P. L.G-P. said that they had been in mediation for two years, implying that O.P. should have given her proof then. The court said: "Well, then I'm ordering you to go to a mediator and resolve all the rest of your issues."

L.G-P. protested that mediation did not work and that the agreement clearly addressed O.P.'s obligations. The court responded by asking how O.P. could provide proof with an FRO in place. L.G-P. suggested an attorney forward her the documents

or a police officer give them to her during parenting-time transfers. The court rejected these suggestions and told her to mediate any disputes.

At oral argument before us, L.G-P.'s counsel was unable to inform us of the total sum of money sought by his client on appeal. L.G-P.'s appellate brief sets forth sixteen points, several of which were withdrawn due to developments subsequent to filing the appeal.[5]

We have set forth this level of detail to illustrate the ongoing, repetitive nature of the parties' disputes, most of which involved no more than a few hundred dollars. The PSA set the parties upon this course because, instead of including the children's extracurricular expenses in the monthly child support amount, it required constantly changing payments, sensitive to many factors such as the particular au pair's expenses and the seasonal sport their son currently played. See Elrom v. Elrom, ____ N.J. Super. ____, ___ (App. Div. 2015) (slip op. at 23). This arrangement required constant contact between the parties and a level of cooperation seldom found in a divorced couple.

---

[5] L.G-P. withdrew her appeal as to the provisions 1) requiring her to cooperate and sign necessary documents to provide O.P. access to the au pair's records and bills, 2) denying her request to find O.P. in violation of the FRO, and 3) ordering O.P. to provide proof through mediation that he has the required life insurance and that his daughter is attending school.

In fact, the level of animosity between these parties ultimately led to an FRO.

## II.

The PDVA was enacted in furtherance of New Jersey's "strong policy against domestic violence." Cesare v. Cesare, 154 N.J. 394, 400 (1998). If a predicate offense is proven, the court must then assess "'whether a restraining order is necessary, upon an evaluation of the fact[or]s set forth in N.J.S.A. 2C:25-29(a)(1) to -(6), to protect the victim from an immediate danger or to prevent further abuse.'" J.D. v. M.D.F., 207 N.J. 458, 475-76 (2011) (quoting Silver v. Silver, 387 N.J. Super. 112, 127 (App. Div. 2006)). Thus, the plaintiff in a domestic violence complaint must prove not only that the defendant committed one of the enumerated acts of domestic violence, but also that an FRO is necessary for the plaintiff's protection.

If an FRO contains a prohibition against contact between the parties, and the domestic violence victim does not seek such contact, a judge in a future proceeding should not suggest that the victim amend the no-contact provision. As our Supreme Court has stated, a judge in a domestic violence action will "grant any relief necessary to prevent further abuse." J.D., supra, 207 N.J. at 476 (quoting Silver, supra, 387 N.J. Super. at 127)(quoting N.J.S.A. 2C:25-29(b)). The judge in this post-

judgement matrimonial matter should have assumed that the judge who ordered the FRO no-contact provision did so pursuant to the appropriate legal standards, and should not have encouraged the domestic violence victim to lessen the protective language of the FRO.

The motion court did not enter the FRO and may not have been familiar with the underlying basis for the entry of the domestic violence order. The specific factual basis for the FRO is not significant, however, because prior to entering such an order, a finding must have been made that the order and the specific relief entered were needed for L.G-P.'s protection. Knowing that she would be in danger without such a protective order, the motion court should not have urged L.G-P. to allow O.P. greater contact with her.

Neither should the court have ordered the parties to work out contested issues through mediation. Although a court rule and directive preclude mediation of certain issues when an FRO is in place, they do not address the situation where a preexisting PSA requires both parental communication and mediation. Rule 1:40-5 covers complementary dispute resolution programs in Family Part matters, and requires court staff to refer appropriate cases to such programs. Rule 1:40-5(a)(1), Mediation of Custody and Parenting Time Actions, precludes

mediation "if there is in effect a preliminary or final order of domestic violence entered . . . ." Rule 1:40-5(b)(1), Mediation of Economic Aspects of Dissolution Actions, states: "[N]o matter shall be referred to mediation if a temporary or final restraining order is in effect in the matter pursuant to the [PDVA.]" See New Jersey Family Division, Directive #11-09 (Nov. 6, 2009), available at https://www.judiciary.state.nj.us/directive/2009/dir_11-09.pdf (instructing staff that mediation in child welfare cases is never appropriate if one party has an active temporary or final restraining order). In Lerner v. Laufer, 359 N.J. Super. 201, 216 (App. Div.), certif. denied, 177 N.J. 223 (2003), we stated in the context of a dismissal of a legal malpractice case where the attorney limited his representation of a matrimonial client to the review of a mediated PSA, "Mediation is now an accepted process in the resolution of family disputes except where an order has been entered under the [PDVA]." (emphasis added).

Parties may contract to disregard settled law in a divorce settlement, including the New Jersey Child Support Guidelines (Guidelines) pursuant to Rule 5:6A (adopting Guidelines set forth in Appendix IX-A to the Court Rules). See Musico v. Musico, 426 N.J. Super. 276, 293 (Ch. Div. 2012) (rejecting husband's argument that above-Guideline child support expressly agreed to automatically decreases to the Guideline level once

there is a change of circumstances); <u>Konzelman v. Konzelman</u>, 158 <u>N.J.</u> 185, 197 (1999) (deferring to the parties' consensual agreement that cohabitation in itself constituted a material change of circumstance terminating alimony, which did not require the normal inquiry into its effect on the dependent spouse's financial status).  A court generally should enforce the provisions of a PSA.  New Jersey "has a strong public policy favoring enforcement of agreements[]" in divorce cases.  <u>Massar v. Massar</u>, 279 <u>N.J. Super.</u> 89, 93 (App. Div. 1995).  "Marital agreements are essentially consensual and voluntary and as a result, they are approached with a predisposition in favor of their validity and enforceability."  <u>Ibid.</u>  So long as the terms of the agreement are fair and equitable, the court will require the parties to abide by them.  <u>Ibid.</u>

Provisions in a PSA that were reasonable at the time of the agreement, however, may well become unreasonable upon the entry of an FRO.  Extracurricular expenses are generally included in the Guidelines calculation.  <u>Elrom</u>, <u>supra</u>, slip op. at 2.  An average amount of extracurricular activities are contained within the Guidelines.  Child Support Guidelines, Pressler & Verniero, <u>Current N.J. Court Rules</u>, Appendix IX-A to <u>R.</u> 5:6A at 2631-32 (2015).  Extraordinary expenses, such as those expended here on the au pair, may be added when child support is

calculated. <u>Id.</u> at 2632. When child support is calculated pursuant to the Guidelines and paid through probation, contact between the parties can be minimized. When circumstances change, the parties may then return to court for a recalculation. Although returning to court may be inconvenient and costly, alternate dispute resolution methods are not safe when an FRO has been entered.

"Our courts have recognized that those who commit acts of domestic violence have an unhealthy need to control and dominate their partners and frequently do not stop their abusive behavior despite a court order." <u>Zappaunbulso v. Zappaunbulso</u>, 367 <u>N.J. Super.</u> 216, 225 (App. Div. 2004) (citing <u>State v. Hoffman</u>, 149 <u>N.J.</u> 564, 585 (1997)). Thus, even if mediation could be conducted in a safe environment, or the parties kept in separate rooms, and the parties are represented by counsel, the bargaining position of the parties could well be distorted by past violence. Mediation is entirely prohibited by statute in domestic violence matters, <u>N.J.S.A.</u> 2C:25-29(a). Mediation is entirely prohibited in child welfare cases, where the parties are usually represented by counsel, after a domestic violence restraining order has been entered, Directive #11-09, <u>supra</u>, and also in pre-trial divorce and non-dissolution actions, <u>R.</u> 1:40-5. When parties agree to mediation at the time of divorce,

they do not anticipate the subsequent entry of an FRO. For reasons of safety, and to conform with the strong public policy of this State, mediation should not be ordered after a subsequent FRO has been entered, even in an effort to conform with the provisions of a PSA.

With regard to the decisions made on this motion that remain the subject of this appeal, we reverse and remand for a plenary hearing. After the hearing, assuming the FRO remains in effect, the court should craft a child support order that encompasses the payment responsibilities set forth in the PSA, without the communication required in the PSA. See New Jersey Domestic Violence Procedures Manual, §4.14.9 (2008), available at https://www.judiciary.state.nj.us/family/dvprcman.pdf (stating that when a court is asked to enter an FRO, and a child support order is already in place, the court should reconsider the issue of support in accordance with the Guidelines to avoid conflicting orders and to avoid the need for communication between the parties). We therefore reverse all of the various procedural and monetary decisions and remand for an evidentiary hearing.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION