874 A.2d 534

VIRGINIA B. PUDER, ESQ., PLAINTIFF–APPELLANT,
v. KATHLEEN BUECHEL, DEFENDANT–
RESPONDENT.

Argued November 29, 2004—Decided June 7, 2005.

────────

*Joseph P. Castiglia* argued the cause for appellant (*Mr. Castiglia* and *Pashman Stein,* attorneys; *Mr. Castiglia* and *Michael S. Stein,* on the briefs).

*David Feinsilver* argued the cause for respondent (*The Feinsilver Law Group,* attorneys; *Mr. Feinsilver* and *H. Jonathan Rubinstein,* on the briefs).

*Christopher J. Carey* argued the cause for amicus curiae, *New Jersey State Bar Association* (*Edwin J. McCreedy,* President, attorney; *Mr. Carey* and *Mr. McCreedy,* of counsel; *Mr. Carey* and *Theodore H. Hilke,* on the brief).

Justice ZAZZALI delivered the opinion of the Court.

In this matter, a matrimonial attorney sued a former client to recover unpaid legal fees arising from her representation of the client in a divorce action. The client responded by filing a malpractice counterclaim against the attorney for negotiating an allegedly inadequate divorce settlement and for failing to obtain informed consent before accepting the settlement on the client's behalf. With the assistance of new counsel, the client then negotiated a second divorce settlement that she deemed "acceptable" and a "fair compromise of the issues." Subsequently, the matrimonial attorney moved for summary judgment on the malpractice counterclaim, arguing that by entering into the second settlement, the client waived her right to sue for malpractice arising from the first settlement. The Law Division granted the motion, but the Appellate Division reversed.

We hold that the client is bound by her representation to the trial court that the settlement was "acceptable" and "fair." Accordingly, we reverse the Appellate Division and remand for reinstatement of summary judgment in favor of the attorney.

## I.

In August 1994, respondent Kathleen Buechel retained petitioner Virginia B. Puder, Esq., to represent her in a divorce action against Dr. Frederick Buechel, her husband of nine years. Puder filed a divorce complaint on behalf of defendant about one month later. The parties twice attempted mediation but failed to resolve the matter. In April 1996, the parties and their counsel appeared before a court-appointed Early Settlement Panel. Dr. Buechel's attorney incorporated the panel's recommendation into a proposed settlement agreement, but Mrs. Buechel rejected the offer. Consequently, from April through July 1996, there were numerous conferences and telephone discussions between counsel and the parties for the purpose of settlement.

The predominant dispute was over the accurate valuation and equitable distribution of several lucrative patents held by Dr. Buechel, an orthopedic surgeon. Mrs. Buechel argued that the patents were worth millions of dollars, evidenced by Dr. Buechel's income rising from $80,000 at the beginning of their marriage to about $4 million in 1994. Mrs. Buechel argued that she was entitled to a share of the royalties generated from these patents. However, Dr. Buechel contended that the patents were declining in value because his principal patent was about to expire and because lawsuits were pending against the patents. It was also Dr. Buechel's position that Mrs. Buechel waived any entitlement to royalty income from the patents by signing a pre-nuptial agreement.

By mid-July 1996, with an August trial date looming, Puder was able to negotiate an oral proposed settlement agreement that she deemed "clearly more favorable to [Mrs.] Buechel than the proposal recommended by the Early Settlement Panel." Indeed, Puder believed that the settlement was a "great deal" for Mrs. Buechel. Among other things, the settlement called for Mrs. Buechel to receive over $1.5 million in cash, a house valued at $400,000, a $100,000 IRA distribution, $100,000 annually in alimony for five years, and $50,000 annually in support for the couple's

three children. Mrs. Buechel would also agree to waive all claims against Dr. Buechel's patents and other business interests. Despite having conducted only limited discovery of Dr. Buechel's assets, Puder recommended that Mrs. Buechel accept the oral settlement and Mrs. Buechel subsequently authorized Puder to do so.

In July 1996, Dr. Buechel's attorney sent Puder a letter memorializing the proposed settlement agreement. The following day, Puder advised the trial court that the parties had orally settled the matter and that the attorneys were in the process of finalizing the written agreement. Over the next few days, the parties worked out the remaining details of the settlement.

In August 1996, Mrs. Buechel consulted with attorney David Feinsilver who characterized the settlement as "ridiculously inadequate." Based on that statement, Mrs. Buechel informed Puder that she would not abide by the settlement's terms. Mrs. Buechel then discharged Puder and retained new counsel, Neil S. Braun, Esq., to represent her in the divorce.

Dr. Buechel moved to enforce the settlement agreement. The trial court ordered that a plenary hearing be conducted to determine whether the parties had reached a binding agreement, and, if so, whether the agreement was enforceable.

In March 1997, while the hearing was still pending, Puder sued Mrs. Buechel for unpaid legal fees and costs associated with her divorce representation. Mrs. Buechel filed an answer and counterclaim, alleging that Puder committed legal malpractice. According to Mrs. Buechel, Puder negotiated an "insufficient and inadequate" settlement agreement "without ... adequate discovery and information concerning [Dr. Buechel's] income and assets." Mrs. Buechel further alleged that Puder accepted the agreement "without properly informing [Mrs. Buechel] of the shortcomings of th[e] proposed settlement and obtaining from her complete authority to enter into it." Mrs. Buechel also moved to stay the malpractice claim until the matrimonial hearing was resolved. The certification filed in support of the motion stated

that a stay was necessary because the malpractice claim would be "rendered moot" if Mrs. Buechel prevailed at the matrimonial hearing. The motion to stay was granted in August 1997.

In June 1998, the trial court held a plenary hearing to determine whether the parties had reached a binding settlement agreement, and, if so, whether the agreement was enforceable. During the hearing, the judge stated several times that he had not, and would not, decide the existence or enforceability of the purported agreement until he heard all the proofs. After six days of testimony, Mrs. Buechel's counsel informed the court that Mrs. Buechel had agreed to settle the divorce.

The new settlement was substantially similar to the disputed settlement. The principal differences between them were that Mrs. Buechel received an additional $100,000 IRA distribution, and $8,000 more per year in alimony with all alimony payments now taxable to Dr. Buechel. On June 30, Mrs. Buechel testified before the trial court that the agreement was acceptable to her and that she entered into it voluntarily:

THE COURT: Okay. Have you read that agreement as—as it's been modified, Mrs. Buechel? . . . .

KATHLEEN BUECHEL: Yes.

THE COURT: . . . . *I don't want you to think that you're being forced or pressured into accept[ing] an agreement.* You've been through an emotional experience, and *I want to make sure that this agreement is acceptable to you.* Is it acceptable to you?

KATHLEEN BUECHEL: Yes, it is.

THE COURT: And you've discussed it thoroughly with Mr. Braun?

KATHLEEN BUECHEL: I have.

THE COURT: . . . . You realize that I was getting close to deciding whether or not there was an enforceable agreement. . . . *I have not yet decided whether or not that agreement was to be enforced.* But that trial was to continue today. It can still continue tomorrow. And I will then decide whether or not there was an agreement to be enforced and if so, whether I consider that agreement to be fair. That can continue. Do you understand?

KATHLEEN BUECHEL: I understand.

THE COURT: Okay. I don't want you to think now that you're being forced to enter into a settlement that you haven't discussed with your attorney, a settlement that you're not satisfied with. *You're telling me that you have discussed it with*

*your attorney and that you think it's a fair compromise of the issues.* Is that accurate?

KATHLEEN BUECHEL: Yes.

THE COURT: You probably feel you're not getting as much as you want. I'm sure your husband feels he's paying more than he should. And if that's true it's probably a test of a fair compromise. *But I have to be satisfied that you are accepting it voluntarily. So I ask you one more time: Are you accepting this compromise voluntarily?*

KATHLEEN BUECHEL: *Yes.*

THE COURT: All right.

[(Emphasis added.)]

Mrs. Buechel's attorney then questioned her regarding the agreement:

MR. BRAUN: And picking up on what [the judge] asked you: Do you feel that your frame of mind right now and for the last hour or so is such where you can make a decision as to whether or not to enter into this agreement? And if you decide to enter into it you understand you'll be bound by it? . . .

KATHLEEN BUECHEL: I understand that.

MR. BRAUN: And—and Miss Buechel, everybody who goes through what you've been through is very upset. Do you feel that—right now as you're called upon to make the decision you're in the frame of mind where you can make an intelligent, knowledgeable free decision with respect to the terms of this agreement?

KATHLEEN BUECHEL: Yes.

MR. BRAUN: [The judge] indicated to you that he would continue with the trial, make a decision. We were ready for your testimony today. We can continue it tomorrow. You're aware of that.

KATHLEEN BUECHEL: Yes, I'm aware of that.

MR. BRAUN: And if you do enter into an agreement you waive your right to that trial and have [the judge] make the decisions.

KATHLEEN BUECHEL: Correct. I know that.

Upon further questioning by her attorney, however, Mrs. Buechel testified that she was only agreeing to the settlement because she believed that the trial court would find the first settlement enforceable and because it was her understanding that the second settlement would not affect the status of her malpractice claim against Puder:

MR. BRAUN: . . . [O]ne of the things that concerns us, you and I . . . is the fact that [the judge] may bond you to this purported agreement that Miss Puder represented she was entering into on your behalf.

KATHLEEN BUECHEL: Yes.

MR. BRAUN: And the exposure of the Court finding that may, in fact, take place is one of the motivating if not the motivating factor to you entering into this agreement.

KATHLEEN BUECHEL: Yes, it is.

MR. BRAUN: And although under this agreement you don't feel you're getting everything you're entitled to—equitable distribution, lifetime alimony, you're entering into this agreement as a compromise fully aware of the exposure that if [the judge] finds that the quote/unquote Puder agreement's enforceable you would be getting less than what you're agreeing to today.

KATHLEEN BUECHEL: That's true.

MR. BRAUN: And I've explained to you that I spoke to your attorney, Pat Collins, in the malpractice case and with—against Puder—and with the proviso I'll just place on the record, it's your understanding that entering into this agreement will not prejudice you in that case. Correct?

KATHLEEN BUECHEL: It's my correct understanding.

. . . .

MR. BRAUN: So that your understanding is by entering into the agreement you are not—you are still preserving any and all claims you have against Miss Puder in connection with her representation of you in this matrimonial action.

KATHLEEN BUECHEL: Yes.

Following this exchange, the trial court ruled that Mrs. Buechel knowingly and voluntarily entered into the second settlement agreement with Dr. Buechel. The judge therefore approved the agreement and granted a judgment of divorce to Mrs. Buechel.

In January 2001, before a different judge, Puder moved for summary judgment on the legal malpractice counterclaim, arguing that Mrs. Buechel waived her right to sue Puder by entering into the second settlement before the validity of the first settlement was determined. The court agreed and granted the motion on that ground. The court also held that Mrs. Buechel's continued prosecution of her legal malpractice claim against Puder would violate principles of judicial estoppel. The court based its decision on the certification filed in support of Mrs. Buechel's motion to stay the malpractice claim, which stated that the claim would be "rendered moot" if Mrs. Buechel prevailed in the matrimonial action. The court concluded that Mrs. Buechel had so prevailed. After the court denied Mrs. Buechel's motion for reconsideration, Mrs. Buechel appealed.

In a published opinion, the Appellate Division reversed and remanded, holding that the trial court erred in dismissing Mrs. Buechel's malpractice counterclaim. *Puder v. Buechel,* 362 *N.J.Super.* 479, 484, 828 *A.*2d 957 (2003). First, the panel concluded that our holding in *Ziegelheim v. Apollo,* 128 *N.J.* 250, 607 *A.*2d 1298 (1992), "plainly allows a former client to bring a legal malpractice action against an attorney for professional negligence in divorce litigation where a settlement ensued." *Id.* at 485, 607 *A.*2d 1298. Second, the panel held that the trial court's use of the judicial estoppel doctrine was erroneous because the conditions justifying application of this extraordinary remedy were not present. *Id.* at 494, 607 *A.*2d 1298.

We initially denied Puder's Petition for Certification. 179 *N.J.* 309, 845 *A.*2d 134 (2004). However, on reconsideration, we granted certification. 180 *N.J.* 147, 849 *A.*2d 181 (2004). We also granted amicus curiae status to the New Jersey State Bar Association (NJSBA).

## II.

Puder maintains that the Appellate Division's decision is an unwarranted extension of our holding in *Ziegelheim.* Puder distinguishes *Ziegelheim* from this case because there we allowed the malpractice action to proceed against the matrimonial attorney only after the trial court found the divorce settlement agreement binding on the client. The absence of such a binding settlement here, Puder asserts, is dispositive of Mrs. Buechel's malpractice counterclaim. Essentially, Puder argues that Mrs. Buechel's voluntary acceptance of the second settlement, prior to the trial court's ruling on enforceability, absolves her of all malpractice liability because the causal link between any damages suffered under the first settlement was irrevocably severed by the second settlement.

The NJSBA, as amicus curiae, reiterates Puder's argument that *Ziegelheim* is distinguishable from this case because Mrs. Buechel settled before the court determined whether the original settle-

ment was binding. The NJSBA also contends that "the Appellate Court's decision is contrary to the well-settled legal principle that the law favors settlements." The NJSBA reasons that "a client should not be permitted to settle a case for less than it is worth ... and then seek to recoup the difference in a malpractice action against [the] attorney." Such tactics, the NJSBA believes, would "have a chilling effect on settlements and settlement negotiations" because attorneys would "disfavor the use of settlements in order to resolve a dispute."

Citing *Ziegelheim*, Mrs. Buechel contends that, given Puder's negligence, she was entitled to mitigate her damages under the first settlement by entering into the second settlement. Accordingly, she claims that her voluntary acceptance of the second settlement does not preclude her from pursuing a malpractice claim against Puder. Moreover, Mrs. Buechel cautions that if we find for Puder, the expense of remedying an unfavorable settlement "would fall upon the innocent client as opposed to the attorney who committed the malpractice."

## III.

Both parties urge us to resolve this matter on the basis of causation. However, we decline to address the causation issue and, instead, hold that fairness and the public policy favoring settlements dictate that Mrs. Buechel is bound by her representation to the trial court that the divorce settlement agreement was "acceptable" and "fair." Those statements clearly reflect Mrs. Buechel's satisfaction with the resolution of her divorce, and, therefore, preclude her malpractice claim against her former counsel. Accordingly, we reverse the Appellate Division and remand for reinstatement of summary judgment in favor of Puder.

### A.

For nearly forty-five years, New Jersey courts have found that the " '[s]ettlement of litigation ranks high in [the] public policy' " of this State. *Nolan ex rel. Nolan v. Lee Ho*, 120 *N.J.* 465, 472,

577 A.2d 143 (1990) (quoting *Jannarone v. W.T. Co.*, 65 N.J.Super. 472, 476, 168 A.2d 72 (App.Div.), *certif. denied*, 35 N.J. 61, 171 A.2d 147 (1961)). Therefore, our courts have actively encouraged litigants to settle their disputes. *E.g., Morris County Fair Hous. Council v. Boonton Tp.*, 197 N.J.Super. 359, 366, 484 A.2d 1302 (App.Div.1984). Advancing that public policy is imperative in the family courts where matrimonial proceedings have increasingly overwhelmed the docket. As the Appellate Division has aptly stated: "With more divorces being granted now than in history, and with filings on the rise, fair, reasonable, equitable and, to the extent possible, *conclusive settlements must be reached,* or the inexorable and inordinate passage of time from initiation of suit to final trial will be absolutely devastating. . . ." *Davidson v. Davidson*, 194 N.J.Super. 547, 550, 477 A.2d 423 (1984) (emphasis added). Consequently, our courts approve numerous settlements in divorce cases *"so long as the parties acknowledge that the agreement was reached voluntarily and is for them, at least, fair and equitable." Lerner v. Laufer*, 359 N.J.Super. 201, 217, 819 A.2d 471 (App.Div.2003) (emphasis added). This practice preserves the "right of competent, informed citizens to resolve their own disputes in whatever way may suit them." *Ibid.*

Here, once informed that the Buechels had decided to settle their divorce, the trial court sought to determine whether Mrs. Buechel entered into the settlement voluntarily and whether she was satisfied with the outcome of the settlement negotiations. The court repeatedly asked Mrs. Buechel whether the agreement was acceptable to her, whether it was a fair compromise of the issues, and whether she accepted the agreement voluntarily—questions that she answered affirmatively. Those responses demonstrate that Mrs. Buechel bargained for, and received, what she believed was an equitable distribution of the marital estate. Thus, any alleged deficiency resulting from the first settlement was ameliorated by the second settlement that she deemed to be fair and equitable. It would contravene principles of fairness and our policy in favor of encouraging conclusive settlements in matrimonial cases to allow Mrs. Buechel to now pursue her attorney for

greater monetary gain. She is bound by her calculated decision to resolve the dissolution of her marriage by accepting her former spouse's settlement offer, a settlement she approved in open court.

### B.

In her brief before the Appellate Division, Mrs. Buechel acknowledges that the settlement agreement "was acceptable to her, was a fair compromise of the issues and that she was entering into the same voluntarily." (Internal quotation marks omitted). However, she contends that her testimony to that effect should not alter her ability to sue Puder because her approval of the second settlement was the consequence of two assumptions: the reasonable likelihood that the trial court would bind her to the first settlement and that her malpractice claim would be preserved.

The Appellate Division agreed that Mrs. Buechel's professed understanding that the trial court would bind her to the first settlement justified her acceptance of the second settlement and her continued pursuit of the malpractice claim against Puder. *Puder, supra,* 362 *N.J.Super.* at 485–90, 828 *A.*2d 957. Specifically, the panel stated that, due to Puder's negligence, Mrs. Buechel "faced the prospect that the settlement might be enforced against her," a "prospect [that] became palpable when her successor attorney told her the matrimonial judge had manifested a tentative disposition to enforce the first settlement." *Id.* at 488, 828 *A.*2d 957. Citing *Spaulding v. Hussain,* 229 *N.J.Super.* 430, 551 *A.*2d 1022 (App.Div.2003), the panel reasoned that this "situation was disadvantageous enough to warrant a ... finding ... that [Mrs. Buechel's] acceptance of the slightly more favorable second settlement was reasonable." *Id.* at 489, 551 *A.*2d 1022. And because "the effects of [Puder's] conduct in respect of the first settlement might well have had an adverse impact upon defendant's position in negotiating the second settlement," the malpractice action could proceed. *Id.* at 491, 551 *A.*2d 1022.

*Spaulding* is factually distinguishable from this matter and, therefore, does not validate Mrs. Buechel's post-second-settlement

malpractice claim. In *Spaulding, supra,* the plaintiff, seriously injured in a slip and fall accident, sued his treating physician after the physician "improperly refused to testify" for the plaintiff in his negligence action against a commercial property owner. 229 *N.J.Super.* at 432, 551 *A.2d* 1022. The complaint alleged that, as the key witness, the physician's failure to appear forced the plaintiff to settle his negligence claim for a "grossly inadequate sum." *Id.* at 432–33, 551 *A.2d* 1022. Therefore, the physician was obligated to make the plaintiff financially whole. *Id.* at 435, 551 *A.2d* 1022. In defense, the physician asserted that the plaintiff was comparatively negligent for accepting the inadequate settlement offer instead of moving for a mistrial or seeking other alternative relief. *Id.* at 442–44, 551 *A.2d* 1022. The Appellate Division rejected this argument, finding that the physician's "nonappearance after he had promised to come ... threatened a litigation catastrophe to plaintiff and his attorney." *Id.* at 444, 551 *A.2d* 1022. Therefore, they "were obviously entitled to deal with the impending catastrophe in any reasonable manner," which included settling the case for a lesser amount and suing the physician for the difference. *Ibid.*

█ Here, unlike the plaintiff in *Spaulding,* Mrs. Buechel was not confronted with a "litigation castatrophe" that required her to accept a lesser settlement and pursue the perceived difference in future litigation. *See Puder, supra,* 362 *N.J.Super.* at 489, 828 *A.2d* 957 (noting that Mrs. Buechel's situation was "perhaps not equivalent to the 'litigation catastrophe' that faced the plaintiff in *Spaulding* "). Yet, Mrs. Buechel claims that she was indeed forced into accepting Dr. Buechel's second settlement offer because the trial court purportedly intimated to her attorney that he would bind her to the first settlement. Although we are mindful that, when reviewing summary judgment motions, we must view the "evidential materials ... in the light most favorable to the non-moving party," *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.2d* 146 (1995), conclusory and self-serving assertions by one of the parties are insufficient to overcome the

motion, *Martin v. Rutgers Cas. Ins. Co.*, 346 *N.J.Super.* 320, 323, 787 *A.*2d 948 (App.Div.2002); *Brae Asset Fund, L.P. v. Newman*, 327 *N.J.Super.* 129, 134, 742 *A.*2d 986 (App.Div.1999). When asked during a deposition what caused her and her attorney to believe that the court would find against them, Mrs. Buechel responded that their decision was based on "a feeling" or "a judgment call." More important, on the very day that Mrs. Buechel accepted the second settlement, the trial judge unequivocally stated on the record that he had *"not yet decided whether or not th[e] [first] agreement was to be enforced."* (Emphasis added.) Therefore, despite her self-serving assertions to the contrary, Mrs. Buechel has failed to present sufficient evidence that the trial court intended to bind her to the first settlement.

Mrs. Buechel also argues that she accepted the second settlement conditioned on the preservation of her malpractice claim against Puder. Similarly, our dissenting colleagues maintain that holding Mrs. Buechel to her acceptance of the second settlement is an unjust result because Mrs. Buechel specifically reserved her right to sue Puder and the trial judge did not advise that her understanding was incorrect. *Post* at 448–49, 874 *A.*2d at 546. However, neither this Court nor any of our lower courts are bound by what essentially amounts to a private agreement between Mrs. Buechel's matrimonial counsel and her malpractice counsel. Upon consideration of all of the circumstances of this appeal—including Mrs. Buechel's sworn representation to the trial court that the settlement was "acceptable" and "fair," the public policy in favor of conclusive settlements, and the passage of almost nine years since Puder negotiated the first settlement—we conclude that Mrs. Buechel is precluded from pursuing this malpractice action.

That said, the trial court's silence in the face of Mrs. Buechel's unilateral, but ultimately ineffective, reservation of rights to pursue damages against her first lawyer is a matter of concern. The better practice would have been for the trial court to intervene in the colloquy between Mrs. Buechel and her attorney, and to

inform Mrs. Buechel that her reservation would not necessarily preserve her ability to bring future related claims.

## C.

Contrary to the Appellate Division's reasoning, our conclusion here does not conflict with *Ziegelheim.* In *Ziegelheim, supra,* the plaintiff sued her former matrimonial counsel for malpractice, claiming that the attorney negotiated, and advised that she accept, an inadequate divorce settlement agreement. 128 *N.J.* at 257, 607 *A.*2d 1298. The complaint alleged that the attorney "failed to discover important information about [the] husband's assets before entering into settlement negotiations." *Id.* at 255, 607 *A.*2d 1298. Furthermore, because the family court denied the plaintiff's motion to set aside the disputed settlement, the only remedy that the plaintiff had left was her malpractice suit against her former counsel. *Id.* at 258, 607 *A.*2d 1298. The trial court granted summary judgment to the attorney. *Id.* at 258–59, 607 *A.*2d 1298. The court found that the plaintiff's malpractice action was precluded because, when accepting the settlement, the plaintiff "had stated on the record that she understood the settlement and its terms, that she thought the terms were fair, and that she had not been coerced into settling." *Id.* at 259, 607 *A.*2d 1298. The Appellate Division affirmed. *Id.* at 260, 607 *A.*2d 1298.

We reversed, holding that the plaintiff could proceed with her malpractice action because "[t]he fact that a party received a settlement that was 'fair and equitable' does not mean necessarily that the party's attorney was competent or that the party would not have received a more favorable settlement had the party's incompetent attorney been competent." *Id.* at 265, 607 *A.*2d 1298. Our holding in *Ziegelheim* is inapplicable to this appeal because there are profound distinctions, both factual and legal, between the two cases. Here, unlike in *Ziegelheim,* Mrs. Buechel's claim against Puder was not her only remedy to the alleged malpractice. Mrs. Buechel made a calculated decision to accept the second settlement—one negotiated by a lawyer other than Puder—*before*

the trial court could decide whether the first agreement was enforceable. As evidenced by its statements on the record, the court could have found that the first settlement was invalid or unenforceable, alleviating the need to sue Puder for malpractice. The burden of Mrs. Buechel's failed legal strategy rests with her, not Puder. Furthermore, unlike the plaintiff in *Ziegelheim*, Mrs. Buechel entered into the second settlement admittedly aware of the discovery deficiencies leading up to the first settlement. Nevertheless, she accepted a second settlement substantially similar to the allegedly inadequate settlement she claimed to be remedying. As the NJSBA argues, "a client should not be permitted to settle a case for less than it is worth ... and then seek to recoup the difference in a malpractice action against [the] attorney."

In sum, our holding in *Ziegelheim* was not meant to "open the door to malpractice suits by any and every dissatisfied party to a settlement." *Id.* at 267, 607 *A.*2d 1298. That is precisely why the *Ziegelheim* Court explained that many malpractice claims "could be averted if settlements were explained as a matter of record in open court in proceedings reflecting the understanding and assent of the parties." *Ibid. Ziegelheim's* reasoning discourages malpractice litigation when a court finds that a plaintiff, although well aware that the attorney was negligent, nevertheless testifies under oath that the settlement was both acceptable and fair.

### D.

A recent Appellate Division decision, *Newell v. Hudson,* 376 *N.J.Super.* 29, 868 *A.*2d 1149 (2005), reinforces our conclusion in this appeal. Although *Newell* was decided on principles of judicial estoppel, implicates different policy considerations, and involves facts that are distinguishable, the panel's reasoning is instructive here. In *Newell,* the plaintiff filed a malpractice claim against her former matrimonial attorney. *Id.* at 33–34, 868 *A.*2d 1149. The plaintiff alleged that the attorney's failure to conduct adequate discovery "resulted in her accept[ing] a settlement which was woefully insufficient in terms of both alimony/spousal support and

equitable distribution." *Id.* at 34, 868 *A.*2d 1149 (internal quotation marks omitted) (alteration in original). Both the trial court and the Appellate Division rejected the malpractice claim, concluding that the plaintiff was bound by her voluntary testimony that the settlement was a fair resolution of her divorce. *Id.* at 30–32, 868 *A.*2d 1149. The Appellate Division noted that the trial court "conducted an exhaustive question and answer session of the [plaintiff] under oath on the record" and that she offered her "understanding and assent to all of the terms of the agreement." *Id.* at 45, 868 *A.*2d 1149.

As we do in this case, the *Newell* panel also found *Ziegelheim* to be distinguishable because, unlike the plaintiff in *Ziegelheim,* the *Newell* plaintiff was not "misinformed of the criteria to be employed or was [not] without full knowledge of the attendant facts prior to adopting" the settlement. *Id.* at 46, 868 *A.*2d 1149. To the contrary, the plaintiff in *Newell* was completely aware of the alleged financial shortcomings of the settlement when she willingly entered into the agreement. *Ibid.* Therefore, the panel determined that her malpractice claim was barred as a matter of law, reiterating that *Ziegelheim* should "not be read so broadly as to 'open the door to malpractice suits by any and every dissatisfied party to a settlement.'" *Id.* at 42–43, 868 *A.*2d 1149 (quoting *Ziegelheim, supra,* 128 *N.J.* at 267, 607 *A.*2d 1298).

Like the plaintiff in *Newell,* Mrs. Buechel's knowing and voluntary acceptance of a settlement that she stated was a fair compromise bars her from proceeding with her malpractice claim. Mrs. Buechel entered into the second settlement admittedly aware of the discovery deficiencies leading up to the settlement. In the words of the *Newell* panel, to allow Mrs. Buechel to now sue Puder for malpractice would afford her the ability to potentially profit from litigation positions that are "clearly inconsistent and uttered to obtain judicial advantage." *See id.* at 46, 868 *A.*2d 1149.

## IV.

Finally, our dissenting colleagues believe that retroactively applying our holding to bar Mrs. Buechel's claim "will effectuate an

unfair outcome." *Post* at 448, 874 *A*.2d at 546. To the contrary,
allowing Mrs. Buechel's claim to proceed would visit substantial
unfairness on Puder. Puder, along with all other parties involved
in this divorce, is entitled to rely on her expectation that Mrs.
Buechel's voluntary statements before the trial court conclusively
resolved the matter. We reiterate that, upon consideration of all
of the circumstances of this appeal-including Mrs. Buechel's char-
acterization of the settlement as "acceptable" and "fair," the public
policy that favors conclusive settlements, and the extensive delay
in this matter—we hold that Mrs. Buechel cannot sue Puder for
malpractice. Given that Mrs. Buechel's litigation against Puder
has lasted almost as long as her marriage to Dr. Buechel, it is time
for closure, if not repose. After evaluating the potential unfair-
ness to both parties if the malpractice action were allowed to
continue, we find that the scales of equity weigh heavily against
Mrs. Buechel's claim.

In conclusion, we hold that Mrs. Buechel is bound by her
testimony before the trial court concerning the acceptability and
fairness of the divorce settlement agreement. Those representa-
tions demonstrate that Mrs. Buechel resolved her divorce in a
manner that was satisfactory to her, precluding her from bringing
a malpractice claim against Puder.

For the foregoing reasons, we reverse the judgment of the
Appellate Division and remand this matter to the trial court for
reinstatement of summary judgment in favor of Puder.

Justice WALLACE, JR., concurring.

I concur. It is my view that Mrs. Buechel has a cause of action
for legal malpractice against Puder, but that her complaint was
properly dismissed because she essentially satisfied the damages
portion of her cause of action when she accepted the second
settlement as a fair and equitable distribution of the marital
assets.

In *Ziegelheim*, the plaintiff ultimately filed her malpractice
action against the defendant, her previous attorney, after her

motion to reopen the divorce decree and set aside the settlement agreement was denied. *Supra*, 128 *N.J.* at 257–58, 607 *A.*2d 1298. The defendant moved for summary judgment. *Id.* at 258, 607 *A.*2d 1298. The plaintiff testified at deposition that the defendant had told her that if the case were tried she would not receive more than twenty percent of the marital assets causing her to agree to the settlement. *Id.* at 258–59, 607 *A.*2d 1298. The trial court granted the defendant's motion, concluding that the plaintiff understood the terms of settlement, believed they were fair, and freely entered into the agreement. *Id.* at 259, 607 *A.*2d 1298. The Appellate Division reversed in part and ordered a trial on whether defendant was negligent "because he convinced [plaintiff] to accept an agreement that a reasonably prudent attorney would have advised against accepting." *Id.* at 260, 607 *A.*2d 1298. We agreed, but also permitted plaintiff to proceed on other counts of her complaint including the failure to make proper investigation, the negligent failure to discover concealed assets, *id.* at 265, 607 *A.*2d 1298, the negligent delay in finalizing the settlement and the failure to correctly memorialize the settlement, *id.* at 266, 607 *A.*2d 1298, and the negligent failure to present the offer in writing so plaintiff could review the terms and assess the fairness of the agreement. *Id.* at 266–67, 607 *A.*2d 1298.

We explained that in reaching our decision,

we do not open the door to malpractice suits by any and every dissatisfied party to a settlement. Many such claims could be averted if settlements were explained as a matter of record in open court in proceedings reflecting the understanding and assent of the parties. Further, plaintiffs must allege particular facts in support of their claims of attorney incompetence and may not litigate complaints containing mere generalized assertions of malpractice. We are mindful that attorneys cannot be held liable simply because they are not successful in persuading an opposing party to accept certain terms. Similarly, we acknowledge that attorneys who pursue reasonable strategies in handling their cases and who render reasonable advice to their clients cannot be held liable for the failure of their strategies or for any unprofitable outcomes that result because their clients took their advice. The law demands that attorneys handle their cases with knowledge, skill, and diligence, but it does not demand that they be perfect or infallible, and it does not demand that they always secure optimum outcomes for their clients.

[*Id.* at 267, 607 *A.*2d 1298.]

The dissent also accepted the right of a settling party to sue his or her lawyer, but concluded that because the plaintiff failed to submit an expert's report on the defendant's motion for summary judgment, the trial court correctly granted judgment in favor of the defendant. *Id.* at 268–69, 607 *A.*2d 1298.

There are clear differences between *Ziegelheim* and the present case. The plaintiff in *Ziegelheim* was unsuccessful in her effort to open the judgment and the settlement agreement. Thus, the plaintiff's only remedy to obtain what she believed was a fair share of the marital assets was to institute a malpractice claim and prove the negligence of her attorney. If plaintiff were ultimately successful in that action, she would have recovered at least the difference between the settlement share defendant obtained and the fair share a competent attorney would have recovered.

In the present case, like the plaintiff in *Ziegelheim,* Mrs. Buechel believed that plaintiff, her first attorney, was negligent in representing her in the initial settlement. However, unlike the plaintiff in *Ziegelheim,* before the trial court ruled on her motion to vacate the settlement, Mrs. Buechel agreed to a second settlement that she believed was fair and equitable. On the occasion of the second settlement, the terms were clearly explained to Mrs. Buechel. Thus, unlike the plaintiff in *Ziegelheim,* Mrs. Buechel was able to recover the difference between the amount she would have received in the settlement Puder obtained for her and the settlement terms her second attorney negotiated for her. Consequently, Mrs. Buechel received all that she was due. Any asserted negligence by Puder did not result in any damages to Mrs. Buechel.

In short, Mrs. Buechel failed to demonstrate that she suffered a loss as a result of Puder's asserted negligence. The determining factor here is not her ultimate attainment of a fair and equitable settlement, but the fact that in reaching the second settlement, Mrs. Buechel recovered all of her damages allegedly suffered from Puder's alleged deficient representation of her in the first settlement.

The result here mirrors the outcome that one would anticipate if the trial court had granted Mrs. Buechel's motion to open the judgment, and thereafter, settlement ensued or a trial concluded on more favorable terms than the original settlement to Mrs. Buechel. In that event, Puder's alleged deficiencies would have run their course because Mrs. Buechel would have received a full recovery.

I recognize that in some other case not before us a person in Mrs. Buechel's shoes may be able to prove damages beyond what he or she might receive in a settlement. For example, if such a hypothetical person were to incur substantial fees and costs that would otherwise not have been incurred and were not recovered as part of the settlement, then that would constitute damages recoverable against the deficient attorney. That is not the case here because Mrs. Buechel recovered her attorney's fees as part of the second settlement.

I concur in the result.

Justice LONG, J., dissenting.

I would affirm the judgment of the Appellate Division substantially for the reasons expressed in Judge Kestin's thorough and thoughtful opinion. Like the Appellate Division I would hold that, in the unique circumstances presented, the settlement of the matrimonial case was not an impediment to Mrs. Buechel's malpractice action against Ms. Puder.

I agree with the Court that, as a matter of policy, a party in Mrs. Buechel's position should in the future be required to pursue an enforcement motion to disposition. I am simply not willing to apply that policy to this case in which it will effectuate an unfair outcome.

Here, Mrs. Buechel stated unequivocally on the record that she was settling *on the condition that* the agreement would not prejudice her in pursuing the malpractice case against Puder. The very experienced trial judge must have thought that the

reservation she expressed would be honored, otherwise he would have advised her that she had no right to any future action against Puder and that her settlement was final for all purposes. If that had occurred, Mrs. Buechel would likely have rethought her position and may have opted for a different course. To hold her to the settlement while denying her right against Puder at this late stage is simply not an outcome that I consider just. Therefore I dissent.

Justice ALBIN joins in the opinion.

*For reversal and remandment*—Chief Justice PORITZ, and Justices LaVECCHIA, ZAZZALI, WALLACE, and RIVERA-SOTO—5.

*For dissent*—Justices LONG, and ALBIN—2.