**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0732-22

AKANSHA SINGH,

    Plaintiff-Appellant,

v.

SOULCYCLE, INC. and
SOULCYCLE SHORT HILLS,
LLC,

    Defendants-Respondents.

_____

Argued September 28, 2023 – Decided July 15, 2024

Before Judges Vernoia and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-6565-19.

Denise Campbell argued the cause for appellant (Campbell Legal Associates, PLLC, attorneys; Denise Campbell, on the briefs).

David N. Kittredge argued the cause for respondents (LaRocca Hornik Rosen & Greenberg, LLP, attorneys; David N. Kittredge, on the brief).

PER CURIAM

In this personal-injury action, plaintiff Akansha Singh alleges that she fell from a stationary exercise bike during a cycling class at an exercise studio owned and operated by defendants SoulCycle, Inc. and SoulCycle Short Hills, LLC. She appeals from an order granting defendants' motion for summary judgment and dismissing her complaint with prejudice. We reverse and remand for further proceedings.

I.

We summarize the material facts gleaned from our analysis of the parties' submissions to the motion court under Rule 4:46-2, viewing the evidence in a light most favorable to plaintiff, the non-moving party, and drawing all reasonable inferences in her favor. See Crisitello v. St. Theresa Sch., 255 N.J. 200, 218 (2023).

On September 9, 2017, plaintiff enrolled in a cycling class at defendants' studio. Defendants required that plaintiff sign a document titled in part as a "WAIVER and RELEASE" (the 2017 waiver) prior to her participation in the cycling class that day. Four years earlier, on December 19, 2013, plaintiff had signed a separate document, titled "NEW RIDER WAIVER FORM" (the 2013 waiver), provided by defendants. The 2013 waiver stated it was for an "indefinite" term.

A-0732-22

On September 9, 2017, plaintiff participated in a cycling class at defendants' studio. The class, "led by instructor Kylie Butler, consisted of two portions: the riding portion, which lasted [forty-five] minutes, and then the post-ride stretch portion."

Prior to the start of the class, defendants had provided "[p]laintiff cycling shoes, which . . . were secured by velcro straps." After placing her feet in the shoes and securing them with the straps, plaintiff "securely clipped" the shoes "into the pedals of the stationary indoor bike selected by [p]laintiff." Plaintiff completed the riding portion of the class "without incident." The class then transitioned to the post-ride stretch portion, "which targeted the hamstrings."

"The post-ride stretch portion . . . was performed while the . . . [c]lass participants were still sitting on their bikes, and by unclipping one shoe [from the bike pedal] and stretching one leg at a time." When riders had "difficulty unclipping" the shoes from the bike pedals, defendants' instructors offered the riders "an alternative method" for disengaging their feet from their attachment to the bike pedals.

Defendants' employee Kristen Mitton "testified that riders 'can slip their foot right out of the shoe' if they are unable to un-clip" the shoe from the bike pedal. Plaintiff, however, "was unable to unclip her left shoe from her bike's

3

pedal," and Butler "noticed" the difficulty plaintiff was having unclipping the shoe from the pedal. "Butler had actual notice of this problem with the shoes worn by other riders in her classes," but the parties dispute how "common" or "uncommon" the problem had been for riders that had attended classes at the studio.

Butler testified that "consistent with" her training, she instructed plaintiff "to remove her foot from the shoe and perform the stretch without the shoe on." In accordance with Butler's instruction, plaintiff removed her left foot from the shoe and "stretched her left hamstring for several minutes . . . , following which it was time for the class to switch to the right hamstring stretch." "Plaintiff followed the same procedure that she had . . . with her left foot" and, with her left foot no longer in the shoe clipped to the left pedal, she "began to remove her [right] foot from the cycling shoe." As she did so, "she fell off the side of the bike." Thus, "[a]t the moment she fell off the bike, [p]laintiff was sitting on the bike, leaning over to the right and attempting to take her right foot out of the shoe[] while he[r] left foot was already out of the left shoe and both shoes were attached . . . to the pedals." Plaintiff suffered significant personal injuries from her fall.

A-0732-22

"Following [p]laintiff's accident, the bike that [p]laintiff had been riding (which was identified as 'Bike #47') was immediately inspected for any problems by [defendants'] personnel and cleared for use by other [of defendants'] guests in the ordinary course of business." "On September 20, 2017, [defendants] received correspondence from [p]laintiff's counsel asking that Bike #47 and the shoes that [p]laintiff [had used] be retained." "By that point . . . Bike #47 had been used . . . for other cycling sessions, such that it is unknown whether the handlebar and saddle" had been adjusted following plaintiff's injury.

After defendants had received correspondence from plaintiff's counsel, they removed Bike #47 "from operation, and stored it in its warehouse for approximately four years while" this litigation was pending. Plaintiff's liability expert, Alan Coté, "inspected and tested Bike #47" on October 15, 2021.

Plaintiff's counsel had also requested that defendants preserve the studio's "surveillance video" footage from the date of plaintiff's injury, but the letter "arrived on a date that was subsequent to the seven-to-ten-day period that" defendants preserved surveillance video footage before it was "automatically overwritten by the recording system's technology."

5

Plaintiff filed a complaint asserting claims against defendants for negligence, negligent spoliation of evidence, and fraudulent concealment of evidence. Defendants filed an answer, the parties engaged in discovery, and defendants moved for summary judgment. Plaintiff filed opposition to the motion and the court heard argument.

In a decision from the bench, the court first rejected plaintiff's contention the motion should be denied because it had not been made returnable more than thirty-days prior to the then-scheduled trial date as required under Rule 4:46-1. In its decision, the court noted the trial date that had been in place when the motion was filed had been adjourned and, at the time argument on the summary-judgment motion was heard, the scheduled trial was three months away. The court reasoned that any grounds to object to the motion based on untimeliness under Rule 4:46-1 that existed when the motion was filed were no longer extant and it explained it would therefore address the motion on the merits.

The court further accepted defendants' contention that plaintiff's claims were barred under the 2013 and 2017 waivers plaintiff had executed prior to participating in the cycling class in which she was injured. The court found the waivers valid and enforceable against plaintiff based on the principles established by the Supreme Court in Stelluti v. Casapenn Enterprises, LLC, 203

6

N.J. 286 (2010), plaintiff was injured while "engaged in an activity that is exactly what was envisioned by the waiver," and plaintiff therefore had waived her right to assert any ordinary negligence claims against defendants.

The court further determined the evidence did not support a claim that plaintiff's injuries were the result of gross negligence, such that the waivers did not bar plaintiff's claims against defendants under Stelluti. The court found there was no evidence of "a reckless or extreme deviation" from the standard of care defendants owed plaintiff and "absent that, . . . a reasonable jury would [not] be able to find gross negligence in this case."

The court entered an order granting defendants summary judgment and dismissing plaintiff's complaint with prejudice. This appeal followed.

II.

We review a grant or denial of summary judgment de novo, applying the same legal standard as the trial court. Crisitello, 255 N.J. at 218. That standard requires that we "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)).

7

"Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "We owe no deference to conclusions of law that flow from established facts." Crisitello, 255 N.J. at 218 (citing State v. Perini Corp., 221 N.J. 412, 425 (2015)).

"A dispute of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Gayles by Gayles v. Sky Zone Trampoline Park, 468 N.J. Super. 17, 22 (App. Div. 2021) (quoting Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017)). "Rule 4:46-2(c)'s 'genuine issue [of] material fact' standard mandates that the opposing party do more than 'point[] to any fact in dispute' in order to defeat summary judgment." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (alterations in original) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529 (1995)). Insubstantial arguments based on assumptions or speculation are not enough to overcome summary judgment. Brill, 142 N.J. at 529. "'[C]onclusory and self-serving

assertions by one of the parties are insufficient to overcome' a motion for summary judgment." Dickson v. Cmty. Bus Lines, Inc., 458 N.J. Super. 522, 533 (App. Div. 2019) (quoting Puder v. Buechel, 183 N.J. 428, 440-41 (2005)).

Plaintiff makes three arguments in support of her challenge to the court's summary-judgment order. First, she contends the court erred by finding the 2013 waiver and 2017 waiver are enforceable against her under the principles explained by the Court in Stelluti. Second, she contends the court erred by applying the incorrect legal standard in its determination plaintiff lacked evidence establishing defendants had committed gross negligence. Last, plaintiff argues the court erred by rejecting her claim defendants' motion was untimely filed under Rule 4:46-1 and should have been denied for that reason.

We reject plaintiff's argument based on the alleged untimeliness of the filing of defendants' summary-judgment motion as without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We note only that we discern no basis to conclude the court abused its discretion by determining it was appropriate to address the merits of the important issues presented by the motion in the absence of any showing plaintiff had suffered prejudice by the timeliness of the filing. See generally Tyler v. N.J. Auto. Full Ins. Underwriting

9

<u>Ass'n</u>, 228 N.J. Super. 463, 467-68 (App. Div. 1988); <u>see also</u> <u>R.</u> 1:1-2(a).  We consider plaintiff's remaining arguments in turn.

Plaintiff contends the waivers she executed in 2013 and 2017 are invalid and unenforceable under the principles established by the Court in <u>Stelluti</u>. More particularly, plaintiff argues the waivers she signed are distinguishable from the waiver the Court in <u>Stelluti</u> found enforceable such that she is entitled to proceed on her ordinary negligence claims against defendants.  Plaintiff also argues the waivers do not bar her claims because she was not engaged in strenuous activity involving an inherent risk of injury at the time she was injured.

"As a general and long-standing matter, contracting parties are afforded the liberty to bind themselves as they see fit."  <u>Stelluti</u>, 203 N.J. at 302 (citing <u>Twin City Pipe Line Co. v. Harding Glass Co.</u>, 283 U.S. 353, 356 (1931)). Nonetheless, "[c]ontracts that purport to exculpate a party from its future carelessness are subject to special rules."  <u>Marcinczyk v. State of N.J. Police Training Comm'n</u>, 203 N.J. 586, 593 (2010).  Exculpatory agreements that absolve a party from future wrongdoing are generally disfavored "essentially because they violate the aims underlying our tort law:  deterrence of careless behavior and compensation by the wrongdoer for injuries sustained by victims."

Ibid. "Such contracts are subjected to 'close judicial scrutiny.'" Vitale v. Schering-Plough Corp., 231 N.J. 234, 247 (2017) (quoting Stelluti, 203 N.J. at 303).

Because an exculpatory agreement results in the relinquishment of a right to seek relief from a party that is alleged to have breached "its common law duty of care," to be enforceable, an exculpatory agreement "must, on its face, reflect the unequivocal expression of the party giving up his or her legal rights that this decision was made voluntarily, intelligently and with the full knowledge of its legal consequences." Gershon v. Regency Diving Ctr., Inc., 368 N.J. Super. 237, 247 (App. Div. 2004) (citing Knorr v. Smeal, 178 N.J. 169, 177 (2003)); see also Stelluti, 203 N.J. at 304-05. "'Any doubts or ambiguities as to the scope of the exculpatory language must be resolved against the drafter of the agreement and in favor of affording legal relief.'" Marcinczyk, 203 N.J. at 593 (quoting Gershon, 368 N.J. Super. at 247). However, "[e]ven if unambiguous," an exculpatory agreement "will not be enforced where [it is] contrary to public policy." Id. at 594 (citing Stelluti, 203 N.J. at 303).

In Stelluti, the Court, in part, considered the enforceability of an exculpatory agreement—a "WAIVER & RELEASE FORM"—executed by the

A-0732-22

plaintiff as a condition of her membership in and use of the defendant's gym.

203 N.J. at 292-93.  As recited by the Court, the agreement provided as follows:

> Because physical exercise can be strenuous and subject to risk of serious injury, the club urges you to obtain a physical examination from a doctor before using any exercise equipment or participating in any exercise activity.  You . . . agree that if you engage in any physical exercise or activity, or use any club amenity on the premises or off premises including any sponsored club event, you do so **entirely at your own risk.**  Any recommendation for changes in diet including the use of food supplements, weight reduction and or body building enhancement products are entirely your responsibility and you should consult a physician prior to undergoing any dietary or food supplement changes.  You agree that you are voluntarily participating in these activities and use of these facilities and premises **and assume all risks** of injury, illness, or death.  We are also not responsible for any loss of your personal property.
>
> This waiver and release of liability includes, without limitation, all injuries which may occur as a result of, (a) your use of all amenities and equipment in the facility and your participation in any activity, class, program, personal training or instruction, (b) the sudden and unforeseen malfunctioning of any equipment, (c) our instruction, training, supervision, or dietary recommendations, and (d) your slipping and/or falling while in the club, or on the club premises, including adjacent sidewalks and parking areas.
>
> You acknowledge that you have carefully read this "waiver and release" and fully understand that it is a **release of liability.**  You expressly agree to release and discharge the health club, and all affiliates, employees,

A-0732-22

agents, representatives, successors, or assigns, from any and all claims or causes of action and you agree to voluntarily give up or waive any right that you may otherwise have to bring a legal action against the club for personal injury or property damage.

To the extent that statute or case law does not prohibit releases for negligence, this release is also for negligence on the part of the Club, its agents, and employees.

If any portion of this release from liability shall be deemed by a Court of competent jurisdiction to be invalid, then the remainder of this release from liability shall remain in full force and effect and the offending provision or provisions severed here from.

By signing this release, I acknowledge that I understand its content and that this release cannot be modified orally.

. . . .

[Id. at 293 (emphasis in original).]

The plaintiff in Stelluti suffered injuries when, during a cycling class, the bike's handlebars dislodged and the plaintiff "fell forward while her feet remained strapped to the pedals." Id. at 293-94. The plaintiff sued and the trial court later granted the defendant summary judgment, in part based on the court's determination the exculpatory agreement the plaintiff had signed was enforceable and barred the plaintiff's claims. Id. at 297. We affirmed the trial court's finding that the agreement was enforceable but rejected its finding that

13

the agreement barred the plaintiff from asserting gross-negligence claims against the defendant. Stelluti v. Casapenn Enters., LLC, 408 N.J. Super. 435, 453-55 (App. Div. 2009). Based on public policy grounds, we limited the enforceability of the waiver to the plaintiff's ordinary negligence claims against the defendant. Id. at 457.

On the plaintiff's appeal, the Supreme Court explained the threshold issue in determining whether an exculpatory agreement is enforceable is whether the agreement "reflect[s]" the plaintiff's "unequivocal expression of . . . giving up . . . her legal rights" and that the decision to do so was "made voluntarily, intelligently and with the full knowledge of" her legal rights. Stelluti, 203 N.J. at 304-05 (quoting Gershon, 368 N.J. Super. at 247). The Court then determined the agreement included the requisite unequivocal expression of the waiver of the plaintiff's rights such that it supported a finding she had waived her rights voluntarily, intelligently, and with full knowledge of those rights. Id. at 305.

More particularly, the Court noted the agreement explicitly stated that it covered the malfunctioning of equipment, the use of all equipment, and the participation in classes. Ibid. The Court further noted the agreement expressly provided that it "covered" the defendant's "negligence," stating "'this release is also for negligence on the part of the [defendant], its agents, and employees.'"

14

Ibid. The Court also explained the agreement included terms limiting the defendant's liability, such as: "'entirely at your own risk,' 'assume all risks,' and 'release of liability,'" that had been "set forth prominently" in the agreement. Ibid.

Also finding the plaintiff had signed the agreement and had not made any claims of fraud, deceit, or misrepresentation, the Court determined the agreement was enforceable as written. Ibid. However, the Court further explained it was also required to determine if the agreement otherwise implicated a matter of public interest, or included a putative waiver of a claim the defendant had breached a duty it had a legal obligation to perform, such that the agreement should be deemed unenforceable on those bases. Id. at 305-06. And the Court held that contractual provisions providing for a waiver of claims founded on reckless or gross negligence are unenforceable on public-policy grounds. Id. at 311-13.

Here, we first address, as the Court did in Stelluti, the threshold question of whether the 2013 and 2017 waivers signed by plaintiff are enforceable exculpatory agreements. See id. at 304-05  For the reasons we explain, we have determined they are not.

A-0732-22

The parties do not dispute that plaintiff executed the 2013 waiver and the 2017 waiver and that the waivers govern our disposition of defendants' contention they jointly constitute an exculpatory contract barring the claims asserted in plaintiff's complaint.[1]  As noted, the 2013 waiver is titled, "NEW RIDER WAIVER FORM," and the language setting forth the putative agreement is preceded by the following subtitle, "ASSUMPTION OF RISK, WAIVER, AND RELEASE."  The text reads as follows:

> By signing up for and/or attending classes, events, activities, and other programs and using the premises, facilities and equipment (individually and/or collectively, the "Classes and Facilities") of SoulCycle Holdings, LLC and its subsidiaries (collectively, "SoulCycle"), I hereby acknowledge on behalf of myself, my heirs, personal representatives and/or assigns, that <u>there are certain inherent risks and dangers in indoor cycling and exercise equipment in association with the Classes and Facilities</u>.  I acknowledge <u>that some of these risks cannot be eliminated</u> regardless of the care taken to avoid injuries.  I also acknowledge that

---

[1]  We recognize plaintiff in the first two counts of her complaint asserts negligence claims and in the third count she alleges defendants engaged in fraudulent conduct.  Neither party argues that distinction among the causes of action in the complaint should affect the disposition of the issues presented on appeal.  We therefore do not address the distinction, see <u>Drinker Biddle & Reath LLP v. N.J. Dep't of L. & Pub. Safety</u>, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011) (explaining issues that are not addressed in a party's initial merits brief on appeal are deemed abandoned), other than to note our determination that the 2013 and 2017 waivers are unenforceable exculpatory agreements renders any issues related to the distinction among the asserted causes of action moot for purposes of this appeal.

the specific risks vary from one activity to another, but range from (1) minor injuries such as scratches, bruises, and sprains; (2) major injuries such as eye injury or loss of sight, joint or back injuries, heart attacks, and concussions; and (3) catastrophic injuries including paralysis and death. I have read and thoroughly understand the SoulCycle Bike Safety Instructions that are posted on SoulCycle's website (www.soul-cycle.com), a hard copy of which was also provided to me by SoulCycle staff. At all times, I shall comply with all stated and customary terms, posted safety signs, rules, and verbal instructions given to me by staff. If in the subjective opinion of the SoulCycle staff, I would be at physical risk participating in SoulCycle's Classes, I understand and agree that I may be denied access to the Classes and Facilities until I furnish SoulCycle with an opinion letter from my medical doctor, at my sole cost and expense, specifically addressing SoulCycle's concerns and stating that SoulCycle's concerns are unfounded. In consideration of being allowed to participate in and access the Classes and Facilities, I hereby (1) agree to assume full responsibility for any and all injuries or damage which are sustained or aggravated by me in relation to the Classes and Facilities, (2) release, indemnify, and hold harmless SoulCycle, its direct and indirect parent, subsidiary affiliate entities, and each of their respective officers, directors, members, employees, representatives and agents, and each of their respective successors and assigns and all others, from any and all responsibility, claims, actions, suits, procedures, costs, expenses, damages, and liabilities to the fullest extent allowed by law arising out of or in any way related to participation in the Classes or use of the Facilities, and (3) represent that I (a) have no medical or physical condition that would prevent me from properly using any of SoulCycle's Classes and Facilities, (b) do not have a physical or mental condition that would put me in any

17

physical or medical danger, and (c) have not been instructed by a physician to not participate in physical exercise. I acknowledge that if I have any chronic disabilities or conditions, I am at risk in using SoulCycle's Classes and Facilities, and should not be participating in any Classes.

I have read this Assumption of Risk, Waiver, and Release Agreement, fully understand its terms, and understand that I am giving up substantial rights including my right to sue SoulCycle under certain circumstances. I acknowledge that I am signing this waiver freely and voluntarily. The term of this waiver is indefinite.

[(Emphasis added).]

On the day of her accident and injuries, plaintiff signed the 2017 waiver that effectively repeats, with minor variations, some of the language in the 2013 waiver. The 2017 waiver reads as follows:

By signing up for and/or attending SoulCycle classes, activities and other programs, and using SoulCycle's premises, facilities, and equipment (collectively, Classes and Facilities), you hereby agree that there are certain inherent risks and dangers in indoor cycling and exercise and in using indoor cycling and exercise equipment in association with the Classes and Facilities. In consideration of being allowed to participate in and access the Classes and Facilities provided by SoulCycle, in addition to the payment of any fee or charge, you hereby (1) agree to assume full responsibility for any and all injuries or damage which are sustained or aggravated by you in relation to the Classes and Facilities, (2) waive, release and forever discharge SoulCycle, its officers, agents, members,

18

employees, representatives, and all others from any and all responsibility, claims, rights, causes of action and/or liability from injuries or damages to your person or property resulting from your participation in and use of the Classes and Facilities, and (3) represent you have no medical or physical condition which would prevent you from attending and/or using any of SoulCycle's Classes and Facilities and/or put you in any physical or medical danger, and have not been instructed by a physician not to do so. SoulCycle hereby advises you that individuals with any chronic disabilities or conditions are at risk in using SoulCycle's Classes and Facilities, and are advised against doing so. In addition, if in the opinion of SoulCycle staff, you would be at physical risk using SoulCycle's Classes and Facilities, you will be denied access to SoulCycle and its Classes and Facilities until you furnish SoulCycle with an opinion letter from your medical doctor, at your sole cost and expense, specifically addressing SoulCycle's concerns, and stating that SoulCycle's concerns are unfounded. If you decline to obtain such a letter, you will not be permitted to use the Classes and Facilities of SoulCycle.

[(Emphasis added).]

The waivers signed by plaintiff include language similar to some of the provisions own which the Court in <u>Stelluti</u> relied to support its conclusion the exculpatory agreement there constituted an enforceable waiver of the plaintiff's right to bring ordinary negligence claims against the defendant. For example, like in <u>Stelluti</u>, the 2013 and 2017 waivers state that plaintiff assumed full responsibility for any and all injuries she sustained while in the class and while

using defendants' facilities and that she released defendants from all responsibility, claims, and liability for injuries she sustained while in a class or while using defendants' facilities. See Stelluti, 203 N.J. at 305.

Those provisions, however, do not constitute the requisite "'unequivocal expression'" that plaintiff gave up her rights to sue defendant for ordinary negligence when they are viewed in the context of the other language in the waivers. Id. at 304-05. In the first instance, unlike in Stelluti, the waivers do not "explicitly" address or "cover[] negligence." Id. at 305. That is, the waivers do not affirmatively state that plaintiff waived her right to bring negligence claims against defendant.

We do not suggest such language is required in every instance for an exculpatory contract to be enforceable. But the failure to expressly refer to negligence claims here is, in our view, misleading by omission. That is because the 2013 and 2017 waivers introduce the waiver language—and provide the context for it—by stating "there are certain inherent risks and dangers in indoor cycling and exercise equipment in association with the Classes and Facilities." Stated differently, the language on which defendant relies is presented in the 2013 and 2017 waivers in the context of the "inherent risks and dangers in indoor cycling and exercise equipment," but we find no basis in the law or logic for a

conclusion that defendants' alleged negligence constitutes an "inherent risk" in a cycling class or the use of a stationary exercise bike. To the contrary, there is nothing inherent in the use of exercise equipment or in exercise itself that includes the negligence of the equipment owner or the leader of an exercise class. And, again, unlike the waiver in Stelluti, neither the 2013 nor 2017 waiver make reference to "malfunctioning . . . equipment[,]" ibid., as presenting one of the risks of injury for which plaintiff assumed the risk and released all claims.

There is a separate but equally dispositive reason the 2013 and 2017 waivers do not constitute "unequivocal expression[s,]" id. at 304-05, of plaintiff's knowing and voluntary right to sue defendant for ordinary negligence. The 2013 waiver is expressly equivocal and vague about plaintiff's right to sue defendant.

At its end, and after all the putative waiver language, the 2013 waiver provides that plaintiff acknowledges that she is "giving up substantial rights including [her] right to sue [defendants] under certain circumstances." (Emphasis added.) The waiver does not define those circumstances, and a plain reading of that language requires the conclusion that despite the putative waiver language that defendants claim bars plaintiff's ordinary negligence claims, the agreement defendants' drafted expressly reserved for plaintiff the authority to

21

sue defendants under certain circumstances. That is hardly an unequivocal waiver of plaintiff's right to sue defendants.

Moreover, the absence of any express provision in the waivers barring a negligence suit, like there was in <u>Stelluti</u>, <u>id.</u> at 305, has additional significance because had such language been included in the 2013 waiver, it might be concluded the "certain circumstances" for which the 2013 waiver permitted plaintiff to sue did not include negligence. In the absence of any express waiver of negligence claims in the 2013 and 2017 waivers, like the language in the waiver on which the Court relied in part in <u>Stelluti</u>, no similar conclusion may be reached here.

There is no reasonable interpretation of the language authorizing plaintiff to sue under certain circumstances that permits a determination the waivers unequivocally barred plaintiff from bringing a suit for ordinary negligence against defendants. The 2013 waiver is wholly ambiguous in that, on the one hand, it purports to provide that plaintiff assumes all responsibility of any injuries she sustains at the studio and releases defendants from all claims and liability for those injuries, while, at the same time, it expressly provides that she gave up her "substantial right . . . to sue" defendants, but only "under certain circumstances." There is nothing unequivocal about that.

22

For those reasons, we are convinced the 2013 and 2017 waivers are unenforceable because they do not reflect an "unequivocal expression" that plaintiff waived her right to bring the claims in her complaint against defendants, and, as such, we cannot conclude she made a decision to forfeit that right "voluntarily, intelligently and with the full knowledge of its legal consequences." Gershon, 368 N.J. Super. at 247 (citing Knorr, 178 N.J. at 177). The 2013 waiver effectively reserved for plaintiff a right to sue defendants "under certain circumstances," and the "'ambiguit[y] as to the scope of'" that reservation within the putative exculpatory contracts "'must be resolved against the drafter[s] of the agreement[, defendants,] and in favor of affording legal relief'" to plaintiff. Marcinczyk, 203 N.J. at 593 (quoting Gershon, 368 N.J. Super. at 247). We therefore reverse the court's summary-judgment order and remand for further proceedings on the claims asserted in plaintiff's complaint.

Because we conclude the 2013 and 2017 waivers do not bar plaintiff's causes of action against defendants, it is unnecessary to address or decide plaintiff's contention that she had otherwise presented sufficient evidence in opposition to defendants' summary-judgment motion to support a cause of action for reckless or gross negligence against defendants. See generally Stelluti, 203 N.J. at 311-13.

Reversed and remanded for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office

CLERK OF THE APPELLATE DIVISION

A-0732-22